GRAHAM YORITA, Individually and as Temporary Administrator of the Estate of EMMETT YORITA, a deceased minor, and SUEKO YORITA, Plaintiffs-Appellees, and GERALD YORITA, a minor, EVELYN YORITA and NANCY YORITA, Plaintiffs, *v.* PETE T. OKUMOTO, Defendant, and STATE OF HAWAII, dba HILO HOSPITAL, Defendant-Appellant

NO. 7337

(CIVIL NO. 3917)

MARCH 29, 1982

HAYASHI, C.J., PADGETT AND BURNS, JJ.

OPINION OF THE COURT BY BURNS, J.

In this negligence case, defendant State of Hawaii, dba Hilo Hospital, appeals the $400,000 judgment entered in favor of plaintiffs. We affirm.

On July 22, 1973, Emmett Yorita, born August 14, 1965, height 4 feet 3 inches, weight 42¾ pounds, was admitted to Hilo Hospital for a tonsillectomy and adenoidectomy. The operation was performed under general anesthesia by Dr. Pete T. Okumoto on July 23, 1973, commencing at approximately 7:35 a.m. and concluding at approximately 8:00 a.m. Emmett was transported to the recovery room where one other tonsillectomy and adenoidectomy patient was being cared for. Emmett arrived at approximately 8:10 a.m., still

anesthetized. The recovery room was staffed by registered nurse (RN) Clara May Swann and licensed practical nurse (LPN) Jill Fujimoto. Emmett resumed consciousness sometime between 8:10 a.m. and 8:13 a.m. Between the time he entered the recovery room and 8:35 a.m., Emmett's condition was within normal limits under the circumstances. The other patient was awake and coughing and required more attention from RN Swann who was standing between Emmett's gurney and the other patient's gurney.

While in the recovery room and sometime after the 8:35 a.m. check on his condition, Emmett suffered a respiratory arrest and a cardiac arrest. Circulation was restored at 9:00 a.m. and respiration was restored at 9:03 a.m., but Emmett never regained consciousness. He died on August 5, 1973.

On August 4, 1975, Emmett's father (individually and as temporary administrator of the deceased's estate), mother, two sisters, and brother brought a wrongful death action against the State of Hawaii, dba Hilo Hospital; Dr. Pete T. Okumoto, the surgeon; Bob Morikawa, the nurse anesthetist; and Dr. Richard Lundborg, the Chief of Anesthesiology at Hilo Hospital. Prior to trial, by stipulation and order, Morikawa and Dr. Lundborg were dismissed as defendants. Emmett's two sisters and brother were dismissed as plaintiffs during the trial.

On September 8, 1975, plaintiffs filed an amended complaint in which they demanded a jury trial against Dr. Okumoto, Dr. Lundborg, and Morikawa. Plaintiffs filed their pretrial statement on January 3, 1978. Circuit Judge Robert Won Bae Chang was assigned to this case on January 18, 1978. On August 28, 1978, the day jury selection began, Hilo Hospital moved for a jury trial of its portion of the case and cited Hawaii Revised Statutes (HRS) § 661-11 (1976). Plaintiffs objected and cited HRS § 662-5 (1976). The trial judge denied the motion. Hilo Hospital also moved for the use of an advisory jury and cited Rule 39(c), Hawaii Rules of Civil Procedure (HRCP). The court denied that motion too.

The jury found in favor of Dr. Okumoto. Immediately thereafter the judge found against Hilo Hospital and awarded damages as follows: to Emmett's estate, $200,000; to Emmett's father, $100,000; to Emmett's mother, $100,000.

The case we are deciding (No. 7337) involves Hilo Hospital's appeal of the judge's decision. In No. 7348, plaintiffs have appealed

the jury verdict in favor of Dr. Okumoto but that case is not now before us.

## I.

Hilo Hospital contends that "[t]he trial judge erred in failing to disqualify himself" since Yorita's counsel, Walter Chuck, as a special deputy attorney general, had previously represented Judge Chang in negotiations with the alleged contemnor after Judge Chang had issued a contempt citation. Hilo Hospital argues that that was not just a case where Judge Chang was only a nominal party with no interest in the outcome, "but an unusual circumstances where [Judge] Chang and Chuck engaged in 'close conference' "; where settlement of the controversy involved Judge Chang's agreement; where in a subsequent and different legal proceeding Chuck asserted an attorney-client privilege with respect to matters involved in that representation; and where the "judge did not voluntarily disclose his prior relationship with plaintiffs' attorney. . . ."

We must decide on the basis of HRS § 601-7(b),[1] the relevant case law, and the Code of Judicial Conduct,[2] Canons 2A and 3C(1),[3]

---

[1] § 601-7   Disqualification of judge; relationship, pecuniary interest, previous judgment, bias or prejudice. * * *
    (b) Whenever a party to any suit, action, or proceeding, civil or criminal, makes and files an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against him or in favor of any opposite party to the suit, the judge shall be disqualified from proceeding therein. Every such affidavit shall state the facts and the reasons for the belief that bias or prejudice exists and shall be filed before the trial or hearing of the action or proceeding, or good cause shall be shown for the failue to file it within such time. No party shall be entitled in any case to file more than one affidavit; and no affidavit shall be filed unless accompanied by a certificate of counsel of record that the affidavit is made in good faith. Any judge may disqualify himself by filing with the clerk of the court of which he is a judge a certificate that he deems himself unable for any reason to preside with absolute impartiality in the pending suit or action.

[2] Rule 19.   JUDICIAL CONDUCT.
    Code.   The Code of Judicial Conduct * * * is adopted as a standard of conduct for members of the Hawaii Judiciary.

[3] CANON 3:   A Judge Should Perform the Duties of His Office Impartially and Diligently.
    * * * In the performance of these duties, the following standards apply: * * *
C. Disqualification
    (1) A judge should disqualify himself in a proceeding in which his impar-

whether (1) Judge Chang had a "personal bias or prejudice" for the plaintiffs or against Hilo Hospital because of Chuck's previous representation of him, (2) his impartiality might reasonably be questioned, and (3) the affidavits were timely filed.

Section 601-7(b), HRS, requires that a judge shall be disqualified whenever a party files a legally sufficient affidavit showing bias or prejudice but contains the critical requirement that the affidavit be timely filed before the hearing or the action or proceeding and, if not, that good cause shall be shown.

Here, the motion for disqualification was made (1) after various pretrial conferences had been conducted, (2) after the judge had ruled on various pretrial motions, (3) on the day after the prospective jurors had taken their oath and *voir dire* had begun and (4) immediately after the judge had denied Hilo Hospital's request for trial by a jury or an advisory jury.

Although there is a statutory exception to untimeliness where good cause is shown, we hold that Hilo Hospital has not shown good cause. Good cause exists where the disqualifying facts were unknown to the party at the time of the proceeding and are newly discovered. *Honolulu Roofing Co. v. Felix,* 49 Haw. 578, 426 P.2d 298 (1967); *In re Bouslog, an Attorney at Law,* 41 Haw. 270 (1956).

Here, the record shows that immediately after the judge denied Hilo Hospital's request for a jury or an advisory jury, counsel for Hilo Hospital asked:

MR. BECK: Your Honor, may we have a short recess because I intend, in light of the Court's ruling on these two matters, I intend to make another motion and I would like to have time to consult with my client for just a few minutes before making such a motion.

The record further shows that the request for a short recess was granted and when the court reconvened, Hilo Hospital immediately moved for disqualification. Hilo Hospital's opening brief candidly admits why the motion was made when it was made: "Had that motion [for a jury or advisory jury] been granted, much of the concern about the judge's possible bias would have been ob-

---

tiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party * * *

viated. . . . When it was denied, defense counsel felt obligated to raise the matter."

Clearly, Hilo Hospital knew of the matters of disqualification before it made its motion for trial by jury or advisory jury. Thus, the rule stated in *In re Bouslog, an Attorney at law, supra*, at 274, applies: "Unless the matters of disqualification are unknown to the party at the time of the proceeding or are newly discovered, there can be no excuse for delaying the filing of the suggestion until after rulings are made in the matter, particularly where such rulings may be considered adverse to the movant."

Assuming the affidavits were timely filed or were within the good cause exception, the judge would then have the duty to examine their legal sufficiency.[4] *See Whittemore v. Farrington*, 41 Haw. 52 (1955).

Hilo Hospital argues that the proper test for disqualification is an objective one as to what a reasonable outsider would believe, not what the judge subjectively believes. We agree. The judge must decide, not whether he would subjectively be biased, but whether the affidavits "give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Whittemore, supra*, at 52.

Even if Hilo Hospital had filed its affidavit in a timely manner, it is not likely that disqualification was required under HRS 601-7(b) (1976). Here, there was no personal representation and no showing of personal bias. *See Glover v. Fong, Auditor*, 39 Haw. 308 (1952). Chuck appeared as a special deputy attorney general, not a personal attorney. Any time that an attorney represents a judge on a contempt matter, consultation between the attorney and the judge is expected, but it does not make the matter personal.

Hilo Hospital argues, however, that even if it has not satisfied the timeliness requirement of 601-7(b), the judge on his own was required to disqualify himself under the Hawaii Code of Judicial Conduct (March, 1977). Canon 3C(1) of the Code of Judicial Conduct states that a judge "should" disqualify himself in a proceeding

---

[4] The trial court may pass upon the legal sufficiency of the affidavits but not the truth or falsity of the facts alleged therein. *Peters v. Jamieson*, 48 Haw. 247, 254, 397 P.2d 575, 581 (1964).

where his impartiality might reasonably be questioned. By contrast, the federal Code of Judicial Conduct, § 28 USC 455(a), states that the judge "shall" disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

The federal test is whether a person, not knowing whether the judge is actually impartial, might reasonably question the judge's impartiality on the basis of all the circumstances, not whether the judge is impartial in fact. *Rice v. McKenzie*, 581 F.2d 1114, 1117 (7th Cir. 1978). Our case does not at all approximate the degree of close relationship requiring disqualification,[5] and we doubt whether a reasonable person would question the judge's impartiality in such a situation.

## II.

Hilo Hospital claims that the trial court erred in not permitting Dr. Lundborg to testify as an expert concerning the existence and effects of heart disease. We disagree.

Dr. Lundborg was "on a contract to the department of health to be head of the anesthesia department at Hilo Hospital."

On direct examination of Dr. Lundborg, Hilo Hospital's counsel asked:

MR. BECK:   Q. Dr. Lundborg, I want you to assume in this case, in the Emmett Yorita case that Dr. Hideo Namiki has found evidence of ventricular septum disease —

Upon objection, the trial court disallowed the question because (1) "an expert cannot be asked to render an opinion based on

---

[5] *See e.g., Rice v. McKenzie*, 581 F.2d 1114, 1117 (7th Cir. 1978) (where federal district judge had participated in same case as Chief Justice of the State Supreme Court); *Rapp v. Van Dusen*, 350 F.2d 806 (3rd Cir. 1965) (where in a mandamus action the judge employed as counsel the successful counsel below to prepare his answer and then consulted with them in absence of the adversaries); *Potashnick v. Port City Construction Co.*, 609 F.2d 110 (7th Cir. 1977) (where judge and counsel had engaged in business dealings and where, while action was pending, counsel represented judge in several unrelated matters); *SCA Services, Inc. v. Morgan*, 557 F.2d 110 (7th Cir. 1977) (where judge's brother was in law firm which represented one of the parties); *Smith v. Sikorsky*, 420 F.Supp. 661 (CD CA. 1976) (where judge's personal attorney worked at law firm representing plaintiff); *Texaco Inc. v. Chandler*, 354 F.2d 655 (10th Cir. 1966) (where attorney had represented judge in a defamation action and defamation action was pending appeal).

another opinion," and (2) during pretrial, Hilo Hospital failed to list Dr. Lundborg as an expert witness. The court stated that Dr. Lundborg could testify as a treating anesthesiologist and as an expert in the field of anesthesiology[6] but not as an expert in the "cardiac or heart area."

Thereafter, counsel for Hilo Hospital asked:

MR. BECK: Q. Dr. Lundborg, based upon the information that you know about this particular boy firsthand, based upon the records which are in evidence, based upon your experience and practice and expertise, I want you to assume that there was additional pathology after Dr. Etta Best, that there was a pathological finding that the boy had congenital idiopathic hypertrophic cardiomyopathy or myocardiopathy. Now, based on that, do you have an opinion based on reasonable medical probability as to the cause of Emmett Yorita's arrest?

Upon objection, the question was disallowed for the two reasons previously given. Immediately thereafter, the judge granted plaintiffs' counsel's motion to strike all of that portion of Dr. Lundborg's testimony "having to do with heart disease."

After Dr. Namiki testified, counsel for Hilo Hospital attempted to recall Dr. Lundborg but was not allowed to do so for the two reasons previously given.

The rule in Hawaii is that admission of opinion evidence is a matter within the discretion of the trial court, and only an abuse of that discretion can result in reversal. *Sherry v. Asing*, 56 Haw. 135, 148, 531 P.2d 648, 658 (1975). For two reasons, we find no abuse of discretion in the trial court's limitation of Dr. Lundborg's testimony.

First, at the time of the trial, the rule in Hawaii was that the opinion of an expert could not be based either in whole or in part upon the opinions, inferences, and conclusions of other witnesses, expert or not.[7] *Cozine v. Hawaiian Catamaran, Ltd.*, 49 Haw. 77, 412 P.2d 669 (1966); AM. JUR.2d, *Expert and Opinion Evidence*, § 42 (1967).

---

[6] Plaintiffs did not object to Dr. Lundborg's testifying as an expert in the field of anesthesiology.

[7] As of January 1, 1981, the rule was changed. *See* Rule 703, Hawaii Rules of Evidence, Chapter 626, HRS.

Second, we have previously stated that "Rule 18(a)(1) of the *Rules of the Circuit Court* must be scrupulously followed if we are to have fair trials."[8] *Cafarella v. Char,* 1 Haw. App. 142, 615 P.2d 763 (1980). *Accord, Cozine, supra,* at 97. Here, the only expert medical witness identified by Hilo Hospital during pretrial proceedings was Dr. Hideo Namiki, a pathologist. Dr. Lundborg was identified as a witness and as Hilo Hospital's designated representative in court[9] but he was never designated as an expert witness.

### III.

Hilo Hospital claims that the trial court abused its discretion by (1) permitting plaintiffs to call Dr. Howard Reidbord, pathologist, as a rebuttal witness and (2) denying it the opportunity to call as surrebuttal witnesses a pathologist (Dr. Grant Stemmerman), a cardiologist (Dr. Bernard Fong), and Dr. Lundborg. We disagree.

The introduction of evidence in rebuttal and in surrebuttal is a matter within the discretion of the trial court and appellate courts will not interfere absent abuse thereof.[10] *Sasaki v. Nakamura,* 26 Haw. 178 (1921); *MacFarlane v. Wilder,* 11 Haw. 673 (1899); 75 AM. JUR.2d. *Trial,* §§ 150, 151, 152 (1974).

To determine whether there has been an abuse of discretion, we must examine the sequence of the trial. Plaintiffs' evidence against the hospital asserted a claim of negligence based on the following events in the following sequence: (1) respiratory arrest, (2) failure to discover the respiratory arrest because of a failure to monitor, (3) cardiac arrest, (4) failure to discover the cardiac arrest because of a failure to monitor, (5) anoxia [lack of oxygen], (6) necrosis [death of tissue] of the brain, (7) discovery of the respiratory and cardiac

---

[8] *Cf. State v. Sugimoto,* 62 Haw. 259, 614 P.2d 386 (1980, and *State v. Feliciano,* 2 Haw. App. 633, 638 P.2d 866 (1982), which are criminal cases in which the prosecutor was allowed to call unlisted witnesses.

[9] Upon objection, the trial judge did not allow Dr. Lundborg to be Hilo Hospital's designated representative in court.

[10] To the extent that evidentiary issues are of concern to one or more parties, they should be anticipated, raised, and settled during pretrial proceedings. It is very risky to rest one's case in chief upon the expectation that relevant evidence may be introduced via rebuttal or surrebuttal.

arrests too late to prevent anoxia and necrosis of the brain, and (8) necrosis of the brain ultimately causing the primary cause of death.

Hilo Hospital's evidence attempted to prove that a hypertrophic [diseased enlargement] cardiomyopathy [disorder of the heart muscle] caused everything else, and even if it did not cause everything else, then its presence limited Emmett's life expectancy to a maximum of ten years.

Plaintiffs' rebuttal witness contradicted defendant's expert pathologist witnesses by testifying "that based on the — the pathological findings contained on the slides and from the autopsy report that Emmett Yorita was not suffering from the heart disease that the defense claims him to have been suffering from."

Defendants attempted to call three surrebuttal witnesses to confirm its witnesses and to contradict plaintiffs' rebuttal witness, but the trial judge would not allow them to do so.

We find no abuse of discretion in this situation. The general rule is that "the party upon whom the affirmative of an issue devolves is bound to give all his evidence in support of the issue in the first instance, and will not be permitted to hold back part of his evidence confirmatory of his case and then offer it on rebuttal." 75 AM. JUR.2d, *Trial,* § 151 (1974) (footnote omitted). However, the rule is not so easily applied when the evidence is negative of a potential defense. Here, we readily understand why plaintiffs did not attempt to prove the negative of Hilo Hospital's heart disease defense during their case in chief and why the trial judge allowed them to do so on rebuttal. We have difficulty understanding why Hilo Hospital would put on two expert witnesses (Dr. Best and Dr. Namiki) to prove the validity of its heart disease defense but would, without the trial court's prior approval, reserve three additional expert witnesses on the same issue for surrebuttal, and we readily understand why the trial judge would not allow it to do so.

## IV.

Hilo Hospital claims that the following findings of fact are clearly erroneous:

11. That at some time between 8:35 a.m. and 8:45 a.m., Emmett Yorita suffered a respiratory arrest in said recovery room.

12. That the respiratory arrest suffered by Emmett Yorita was not discovered until Nurse Swann had turned from attending to the other patient and saw that Emmett was anoxic and had turned blue.

13. That the respiratory arrest suffered by Emmett Yorita was not discovered until such time had elapsed so as to render ensuing resuscitative measures ineffective.

14. That the period of time which elapsed between the arrest and its discovery resulted in severe brain damage to Emmett Yorita and ultimately caused his death.

15. That the Court finds that Emmett Yorita was not suffering from congenital ideopathic hypertrophic cardiomyopathy which Defendant contended had caused Emmett Yorita to suffer a cardiac arrest in the said recovery room for the following reasons:

a. That expert testimony established that in order to have the disease, the ventricular septum separating the right ventricle from the left ventricle of the heart had to be hypertrophic (enlarged).

b. That hypertrophy of the ventricular septum would be disclosed upon gross [using the unaided eye] autopsy examination and should be included in the gross findings.

c. That the only person who made a gross autopsy examination of Emmett Yorita's heart was Dr. Etta Best, pathologist for many years for Hilo Hospital, who was called by the Defendant to testify and who testified that her gross examination revealed no such hypertrophy and further testified that her gross and microscopic examination of Emmett Yorita's heart revealed no heart disease of any kind.

d. That the testimony of the Defendant's pathologist, Dr. Namiki, and the Plaintiffs' pathologist, Dr. Reidboard, neither of whom did a gross autopsy examination of Emmett Yorita but only microscopic examinations, were in conflict as to the existence of such a disease in Emmett Yorita's heart.

e. That the Court accepts the autopsy findings of Dr. Best that there was no heart disease and no hypertrophic ventricular septum.

We determined whether findings of fact are clearly erroneous under Rule 52(a), HRCP, by application of the following standard of

review:[11] Findings of fact are clearly erroneous unless supported by substantial evidence in the record. *Shoemaker v. Takai,* 57 Haw. 599, 561 P.2d 1286 (1977). Substantial evidence is credible evidence which is of sufficient quantity and probative value to justify a reasonable person in reaching a conclusion. *In re Charley's Tour & Transp. Inc.,* 55 Haw. 463, 522 P.2d 1272 (1974). Even though the findings are supported by substantial evidence, they may be set aside on appeal if the appellate court decides that they are against the clear weight of the evidence or otherwise reaches a definite and firm conviction that a mistake has been made.[12] *DeFries v. Association of Owners,* 57 Haw. 296, 555 P.2d 855 (1976); *State v. Patterson,* 58 Haw. 462, 571 P.2d 745 (1977); 9 Wright & Miller, Federal Practice and Procedure: *Civil* § 2585 (1971); 2 Wright, Federal Practice and Procedure: *Criminal* § 374 (1969).

### A.

Hilo Hospital contends that findings of fact 11, 12, 13, and 14 "are against the weight of the evidence and rest on circumstantial evidence which is inconsistent with clear, uncontested, direct testimony." Apparently it concedes that the findings are supported by substantial evidence. The issue, then, is whether we agree that the findings complained of are against the clear weight of the evidence or whether we otherwise reach a definite and firm conviction that a mistake has been made. To decide this issue, we must examine the evidence.

Hilo Hospital's allegedly "clear, uncontested, direct testimony" came from RN Swann, Dr. Lundborg, and Hilo Hospital's records.

RN Swann testified that she checked Emmett's vital signs at 8:35 a.m. and found the signs to be within the range of normal; "[a]t approximately 8:40" while reading his blood pressure, she "could not get a brachial pulse and . . . could only feel intermittent radial pulses" and, thereafter, no pulse; she asked LPN Fujimoto to get help; first came Morikawa, then Dr. Ballerini, and finally Dr. Lundborg; Emmett was "then changing color"; Morikawa administered

---

[11] *See* n.11, *Clarkin v. Reimann,* 2 Haw. App. 618, 638 P.2d 857 (1981).

[12] This exception does not apply to appellate review of jury verdicts. *DeFries, supra.*

oxygen; Dr. Ballerini "gave the first cardiopulmonary resuscitation"; Emmett was "not breathing"; Emmett was connected to the cardiac monitor on the crash cart which came from the operating room, and there was "no response on the scope"; at 8:45 a.m. she called a Code 99 alarm; Dr. Okumoto arrived; Dr. Walker arrived; the crash cart from ICU arrived; various other personnel arrived.

Dr. Lundborg testified that when he arrived, Morikawa was ventilating Emmett with "a hundred percent oxygen" and he (Dr. Lundborg) "could see the chest moving nicely"; Dr. Ballerini was doing cardiac massage; Emmett "seemed to be flacid"; "he was just lying there completely limp. His color was poor. By that I mean it was like blueish, dark. . . . He did not seem to respond to all the — by that I mean by movement or resisting or fighting the attempts to breathe for him"; RN Swann told him that the first notice she had of Emmett's difficulty was "that the color started to get bad first"; Morikawa did a laryngoscopy and "didn't see anything"; they "put an endotracheal tube down into the trachea . . . suctioned . . . and it was absolutely clear." They "couldn't get the heart to really pump well." The EKG showed a "very fast heartbeat." They were not able to generate a reasonably good cardiac output until "after the calcium was given. . . ."

Hilo Hospital's written records contain the following relevant information:

POST ANESTHESIA RECOVERY RECORD [Entries by RN Swann]

    8:30   Resting quietly
    8:35   B.P. 104/60; Pulse 120; Resp. 24
    8:45   No pulse no resp. Code 99 called. RT 99[6]

NURSES WORK SHEET (CODE 99)

[Entries by RN Ednie who allegedly arrived at 8:46 a.m.]

    C.P.R.:   Time Started:   8:42
    Alarm Sounded (Time):   8:45
    Crash Cart Arrived (Time):   8:49

    *Medications:*   (Time & Dose):
        $NaHCO_3$ (500 cc) 8:45 a.m.
        Epinehprine (1:1000) IV 8:50 a.m. direct push
        Calcium Gluconate (10%) 8:52 a.m. (1.0 gm)
        Adrenalin 1:10,000 IV at 8:52

*Vital Signs:*

Blood gasses at 8:57 a.m. by Dr. Lundborg
Circulation Restored: Yes X In VT at 9 a.m.
Respirations Restored: Yes X 9:03
Transferred to CCU #1 at 10:05

ANESTHESIA RECORD:

Postoperative Complications [Entry by Dr. Lundborg]

At 8:42 (best approx) child suddenly stopped resp & started to turn blue * * *

CCU LABORATORY SUMMARY SHEET

[Analysis of blood gasses]

| Date | Time | Na | K | Cl | $HCO_3$ | pH | $PO_2$ | $PCO_2$ |
|------|------|-----|-----|----|---------|------|--------|---------|
| 7/23/73 | 8:57 | 131 | 7.4 | 95 | 14 | 6.99 | 295 | 60 |

LPN Fujimoto's testimony did not shed any light on what Emmett's condition was when RN Swann asked her to go get help. Moreover, Morikawa and Dr. Ballerini, the first two people who responded to LPN Fujimoto's call for help, were not called as witnesses during the trial. Morikawa's deposition is unopened.

Dr. Lundborg testified that a lack of oxygen to the brain for just "a few minutes" causes brain damage. Dr. Leonard C. Arnold, plaintiff's expert physician, testified that "if the brain is deprived of oxygen for a period of five to seven minutes, you will suffer irreversible brain damage."

Dr. Arnold concluded from the $PCO_2$ reading and the other records that Emmett experienced "apnea [cessation of breathing] for seven and a half minutes or at the most apnea for 15 minutes" but "that it was closer to the seven and a half minutes."

The following uncontested findings of fact also have a bearing:

5. That the standard of care required of recovery room personnel of hospitals, similar to Hilo Hospital and located in the same or similar communities on July 23, 1973 was to carefully observe and monitor patients on a minute by minute basis until such time as their condition had stabilized sufficiently to permit their transfer to other areas of the hospital.

6. That the standard of care in existence on July 23, 1973 and applicable to hospitals such as Hilo Hospital required recovery room personnel to record significant clinical events and

observations at the time such occurred or were observed, or as soon thereafter as was reasonable, on forms, such as the post anesthesia recovery record, which were a permanent part of the patient's hospital records.

16. That the only person who could have had personal knowledge of the time that the respiratory arrest occurred was Clara Mae Swann. She had recorded "8:45 — no pulse, no respiration . . ." on the post anesthesia recovery room record, but in Court testified that it had actually occurred at about 8:40 a.m.; which she had never recorded in any of the hospital records although recording of the time of such a clinically significant event was a part of her required duties under the Code 99 procedures of Hilo Hospital then in effect.

17. That based on the demeanor of Nurse Swann on the witness stand, her reluctance to answer, her evasive answers and her inconsistent and illogical testimony, the Court rejects the oral testimony of Nurse Swann as to the time of the arrest and as to the diligence with which she monitored Emmett Yorita on the basis that her testimony lacks credibility. Likewise, the Court does not accept as accurate the information with respect to the time of the arrest conveyed by Nurse Swann to other hospital personnel.

In our view, the record supports the trial judge's findings that Emmett's problem was discovered too late. That being the situation and considering the circumstances, we think he was logically entitled to conclude that the failure to discover was caused by a failure to monitor "on a minute by minute basis."

Hilo Hospital relies on *Bulatao v. Kauai Motors, Ltd.,* 49 Haw. 1, 406 P.2d 887 (1965), for the principle that "[a] fact cannot be established by circumstances which are perfectly consistent with direct, uncontradicted, and unimpeached testimony that the fact does not exist." *Id.* at 8, quoting 32A C.J.S. *Evidence* § 1039 at 755-56. In *Bulatao* it was necessary to plaintiff's case to establish that an air filter had not been put back on the car after repair, thus causing a fire and injury to the plaintiff. The plaintiff tried to establish this by circumstantial evidence, but defendant presented the direct eyewitness testimonies of a fire department officer and a police officer who responded to the call at the time of the accident.

*Bulatao* is not in point, however, for two reasons: (1) As to the

crucial time, there is no direct, unimpeached evidence. RN Swann's testimony was discredited, LPN Fujimoto did not witness the relevant events, Bob Morikawa and Dr. Ballerini did not testify, and Dr. Lundborg arrived after resuscitative measures had already begun. (2) The court in *Bulatao* more than once specifically qualified the principle relied upon: "If this were solely the testimony of employees of the defendant we might not reach the result reached here. . . ; [h]ere was a disinterested witness who gave positive, unimpeached eyewitness testimony." *id.* at 7; and "[i]n any event, the rule we have cited concerning uncontradicted eyewitness testimony can rest, as we have rested it, on the testimony of Lieutenant Rita and Officer Morris; we prefer not to consider the testimony of employees of defendant in this connection." *Id.* at 10.

### B.

Hilo Hospital contends that finding of fact 15 is "not supported by the evidence and [is] based on an erroneous placement of the burden of proof upon [it]." We disagree.

Sometime after Emmett's respiratory and cardiac arrest problems but on the same day, an x-ray was taken and the report, in relevant part, stated:

X-RAY REPORT [By Dr. William E. Spies]

Cardiac silhouette appears normal in size and configuration.

Dr. Etta Best, the pathologist (on contract) for Hilo Hospital since 1961, performed the autopsy and her findings, in part, are as follows:

AUTOPSY REPORT [By Dr. E. W. Best]

Final Anatomical Diagnoses

1. Bronchopneumonia
   * * *
5. Left ventricular hypertrophy, moderate, with subendocardial hemorrhage
6. Cerebral edema with necrosis of brain
   * * *

Gross Autopsy Examination

The heart appears large for a child of this size. It weighs 110 grams. The left ventricular wall is thickened to

.. 1.0 cm. There is hemorrhagic discoloration of the endocardium of the septal surface of the left ventricle.
Microscopic Examination
The cardiac muscle itself is not remarkable.

Dr. Best testified that she noticed nothing unusual about the thickness of the septum; that she did not make a determination as to the cause of Emmett's cardiac and respiratory arrests; that nobody asked her to make such a determination; and that her autopsy determined the primary cause of death as bronchopneumonia.

Hilo Hospital's expert pathologist, Dr. Hideo Namiki, testified that he "found evidence to support a diagnosis of hypertrophic cardiomyopathy." Plaintiffs' expert pathologist, Dr. Howard Reidbord, testified that the heart weight was normal, the thickness of the ventricle was normal, and that it is absolutely impossible for ideopathic hypertrophic cardiomyopathy to occur in a heart of normal weight.

We agree that on the issue of causation, it was plaintiffs' burden to prove that the failure to monitor was a substantial factor in the causation of the necrosis of the brain. *McKenna v. Volkswagenwerk*, 57 Haw. 460, 465, 558 P.2d 1018 (1977). We also agree that plaintiffs had the burden on the issue of damages and that we should not affirm the amount of damages awarded if Emmett's heart was diseased as alleged. *Lopez v. Wigwam Dep't Stores*, 49 Haw. 416, 421 P.2d 289 (1966). Apparently, Hilo Hospital's analysis is that if Dr. Namiki's and Dr. Reidbord's testimonies cancel each other, then it should win on both issues because plaintiffs have the burden of proof as to each. What Hilo Hospital's analysis fails to recognize is: (1) the trial judge discounted Dr. Namiki's and Dr. Reidbord's opinions about the existence or non-existence of congenital ideopathic hypertrophic cardiomyopathy only insofar as such opinions were based on their respective microscopic examinations of heart tissue; the trial court did discount all their testimonies; and (2) the other evidence in the record adequately supports the trial judge's finding of fact. 15.

Affirmed.

*Richard R. Clifton (William L. Fleming* with him on the brief; *Cades, Schutte, Fleming & Wright* of counsel) for defendant-appellant.

*Walter G. Chuck (Allison H. Lynde* with him on the brief) for plaintiffs-appellees.