HAWAII LEASING, a registered limited Hawaii partnership, by its general partner, Amfac Financial Corp., a Hawaii corporation, Plaintiff-Appellee, *v.* LEROY KLEIN and B.A. YORKSHIRE, Defendants-Appellants

NO. 9810

(CIVIL NO. 51176)

MARCH 14, 1985

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY TANAKA, J.

In an action based on a contract of guaranty, defendants Leroy Klein (Klein) and B.A. Yorkshire (Yorkshire) (collectively Defendants) appeal from the judgment in favor of Hawaii Leasing (Plaintiff), a registered Hawaii limited partnership.[1] We affirm the judgment except we set aside the award of costs and attorney's fees.

The dispositive issues on appeal and our answers are:

1. Whether the trial court erred in not finding that Plaintiff breached its obligation to Defendants under the contract of guaranty and in not concluding that Defendants were thereby discharged as guarantors. No.

2. Whether the trial court abused its discretion in its award of costs and attorney's fees. Yes.

---

[1] This is the second appeal in the case. In the first appeal, we affirmed the judgment rendered against Defendants regarding Plaintiff's claim arising from Equipment Lease No. 2650 and reversed the summary judgment against Defendants based on their guaranty of Equipment Lease No. 2571 and remanded the matter for trial. *Hawaii Leasing v. Klein,* 4 Haw. App. 1, 658 P.2d 343 (1983).

In 1969 Defendants incorporated Roybud Corporation of Hawaii, Inc. (Roybud) with Yorkshire as its president. Plaintiff agreed to purchase a Hannah Model 200E Challenger car wash equipment (Challenger) and lease it to Roybud on condition that Klein and Yorkshire would personally guarantee the lease.

On November 19, 1969, Defendants signed an agreement guaranteeing the payment of all rents and other sums to become due and payable under certain equipment lease agreements between Plaintiff and Roybud. The guaranty provided, *inter alia,* as follows:

7. Notwithstanding anything to the contrary herein, it is expressly understood and agreed between Hawaii Leasing and the Guarantors that in the event of a default under the Lease Agreement by the Lessee, then in such event, Hawaii Leasing shall first sell the equipment leased under the Lease Agreement in the manner provided in the Lease Agreement before proceeding against the Guarantors in the manner set forth herein; and further, the obligation of the Guarantors herein is limited to forty percent (40%) of all amounts then due or past due and the present value of all rent not yet due plus the reversionary value of the equipment at the expiration date of the lease (present value to be computed at 11% per annum).

Exhibit 1. The guaranty was supplemented by the following provision:

This letter constitutes our agreement that the guarantor (or lessee) in case of default, shall have a minimum of 30 days in which to sell the leased equipment in the most expeditious and profitable manner.

Exhibit C.

On December 4, 1969, Roybud executed Equipment Lease No. 2571 which required monthly rental payments of $1,962.57 for 60 months commencing May 15, 1970. The Challenger, purchased for $86,623.68, was installed in a service station in Waipahu[2] leased by Roybud from Union Oil Company of California (Union Oil).

---

[2] In *Hawaii Leasing v. Klein, supra,* we stated that the car wash equipment under Lease No. 2571 was located at Pearl City because the briefs so indicated. However, the evidence adduced at trial shows that the equipment was installed at the Union 76 service station located on the corner of Farrington Highway and Leoku Street in Waipahu, Oahu.

Within a few months Roybud was in default on the equipment lease because the business was unprofitable. On February 2, 1971, Plaintiff, Roybud, and Defendants signed a letter agreement whereby Plaintiff extended and deferred the monthly payments to October 15, 1971 and Defendants raised their personal guaranty liability from 40% to 75%.

After the extension and deferral period expired, the equipment lease remained in default. Despite numerous demands by Plaintiff, neither Roybud nor Defendants cured the default, and payments in arrears were $16,485.60 on June 23, 1972, $22,667.70 on October 10, 1972, and $99,175.96 on March 25, 1976.

In the interim, beginning February 1971, Roybud and Yorkshire sought a purchaser for the Challenger. In 1972 Yorkshire tried to sell the Challenger to Union Oil without success. On May 16, 1973, Roybud authorized Union Oil to look for a new dealer for the service station and to negotiate with Plaintiff about taking over the equipment lease. Union Oil was unable to find a new dealer interested in purchasing the Challenger.

In October 1973, Union Oil evidenced an interest in purchasing the Challenger for $20,000, a value established by its engineering department, and Plaintiff indicated its interest in selling to Union Oil. However, no sale of the Challenger was effected to Union or anyone else in 1973 or 1974, despite Yorkshire's efforts to sell it to other parties.

Sometime prior to February 4, 1975, Roybud surrendered its service station lease and Union Oil leased the service station to a new dealer, Harold Iseri (Iseri). Yorkshire continued his attempt to sell the Challenger, which remained at the service station, to other service station dealers and U-drive outfits but was unsuccessful.

As an interim solution Plaintiff and Yorkshire agreed to rent the Challenger to Iseri for $600 per month for a six-month trial period commencing April 7, 1975. On November 24, 1975, Yorkshire met with representatives of Plaintiff and Union Oil. He was advised that Iseri could only pay $200 per month for the Challenger until his gasoline sales increased and that another six-month trial period was necessary to determine whether a buy-out was feasible. During the second six-month period, Iseri was to pay Plaintiff a minimum of $200 per month matched by a $200 per month payment by Yorkshire. Thereafter, Iseri paid Plaintiff $250

per month, but Yorkshire paid nothing.

On March 25, 1976, Yorkshire received Plaintiff's letter which demanded full payment by April 9, 1976 of $99,175.96 owed by Roybud and Defendants. The letter further stated that Plaintiff "will exercise every remedy available to collect the funds due [it]" and that "Union Oil might be willing to buy the car wash for approximately fifteen to twenty thousand dollars." Exhibit 27.

In a March 30, 1976 letter, Yorkshire requested more time and reported that he had informed Klein of the demand. In his April 21, 1976 letter, Yorkshire wrote that Klein had failed to respond. Furthermore, Yorkshire made a settlement offer that (1) he pay $20,000 for a full release, (2) Plaintiff sell the Challenger at its own terms and price, and (3) Plaintiff settle separately with Klein.

Plaintiff rejected Yorkshire's offer and on April 27, 1976, offered to sell the Challenger to Union Oil for $20,000. Union Oil accepted the offer and paid the purchase price in December 1976.

After determining the deficiency owed by Roybud under the equipment lease, Plaintiff sued Defendants under the guaranty for 75% of the deficiency. After a bench trial, the trial court ruled in favor of Plaintiff, and Defendants timely appealed.

I.

At the outset, we hold that the law applicable to this case is the law of contracts pertaining to guaranty and not Hawaii Revised Statutes (HRS) ch. 490, art. 9 (Hawaii Uniform Commercial Code Article 9 — Secured Transactions).[3] The November 19, 1969 agreement is collateral to Roybud's principal obligation under the equipment lease and binds Defendants to pay the lease rentals and other required sums upon Roybud's default, and is, therefore, a contract of guaranty. *Waikiki Seaside, Inc. v. Comito,* 3 Haw. App. 103, 641 P.2d 1363 (1982); *Liberty Bank v. Shimokawa,* 2 Haw. App.

---

[3] Defendants' theory of the case below was that the equipment lease was a secured transaction and that Plaintiff had violated the notice requirement of HRS § 490:9-504(3) and "commercially reasonable" requirement of HRS § 490:9-507 in selling the Challenger. However, on appeal both Defendants and Plaintiff agree that the issue of whether the equipment lease was a secured transaction is irrelevant since the crucial issue is whether Plaintiff sold the Challenger in a "commercially reasonable manner."

280, 632 P.2d 289 (1981). Defendants' liability, if any, is based on that contract of guaranty and not the equipment lease.

A contract of guaranty may be absolute or conditional. A guaranty is absolute if the guarantor promises that upon the debtor's failure to perform his obligation, the guarantor will perform some act to or for the benefit of the creditor. *See International Trust Co., Ltd. v. Suzui,* 31 Haw. 34 (1929). A guaranty is conditional, however, if "as a condition to liability on the part of the guarantor, the happening of some contingent event (other than the default of the principal debtor) or the performance of some act on the part of the creditor" is required. 38 Am. Jur. 2d *Guaranty* § 21 at 1020 (1968). Here, the contract of guaranty was conditional since Defendants' liability was contingent upon Plaintiff's selling the Challenger should Roybud default under the equipment lease, subject to the right given to Defendants or Roybud to initially sell the Challenger within a minimum period of 30 days after Roybud's default.

The general rule is that "any action or omission by the creditor in breach of an obligation to the guarantor which injures the guarantor or the rights of the guarantor operates to discharge the guarantor, at least to the extent of the injury." 38 Am. Jur. 2d *Guaranty* § 79 at 1086 (1968). Thus, the crucial question in this case is whether Plaintiff breached any obligation to Defendants imposed on Plaintiff by the contract of guaranty. Since there is substantial evidence in the record to support the trial court's finding of no breach by Plaintiff, the finding is not clearly erroneous. *See Stewart v. Smith,* 4 Haw. App. 185, 662 P.2d 1121 (1983); *Yorita v. Okumoto,* 3 Haw. App. 148, 643 P.2d 820 (1982). Moreover, concerning that finding, our review of the entire record does not leave us with a definite and firm conviction that a mistake has been made. *Waugh v. University of Hawaii,* 63 Haw. 117, 621 P.2d 957 (1980); *Kim v. State,* 62 Haw. 483, 616 P.2d 1376 (1980); *Block v. Lea,* 5 Haw. App. 266, 688 P.2d 724 (1984).

### A.

Plaintiff fulfilled its obligation of giving Roybud and Defendants an opportunity to sell the Challenger for a minimum period of 30 days after Roybud defaulted. In fact, they had almost 4-1/2

years to sell the Challenger — from October 15, 1971, when the extension and deferral period expired and Roybud was in default, until April 9, 1976, the deadline specified in Plaintiff's March 25, 1976 demand letter. The evidence discloses full cooperation at all times by Plaintiff with Roybud's and Defendants' efforts to sell the Challenger. For example, Plaintiff agreed to a year's trial rental to successor service station dealer Iseri because of the possibility that Iseri could purchase the equipment.

### B.

The contract of guaranty further obligated Plaintiff to sell the Challenger "in the manner provided in the Lease Agreement" before proceeding against Defendants. The equipment lease merely provides that Plaintiff "may sell or otherwise dispose of Equipment, with or without notice and on public or private bid." Exhibit 2. However, this does not mean that Plaintiff could sell the Challenger with impunity for it had "a duty of good faith and fair dealing" in performing its contractual obligation. Restatement (Second) of Contracts § 205 (1981).[4]

Good faith performance "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Id.* comment a. The justified expectation of Defendants was that Plaintiff would sell the Challenger in a manner and at a price which were commercially reasonable under the circumstances.[5] The trial court's finding that the sale of the Challenger to Union Oil for $20,000 in 1976 was "commercially reasonable under the circumstances" is not clearly erroneous.

There is substantial evidence in the record to support the trial court's findings that (1) Plaintiff gave Defendants notice of its in-

---

[4] Restatement (Second) of Contracts § 205 (1981) reads:
> Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

[5] We do not agree with Defendants that in determining whether the private sale of the Challenger was commercially reasonable the criteria in HRS § 490:9-504(3) (notice requirement), HRS § 490:9-507 ("commercially reasonable" standard), and pertinent Uniform Commercial Code case law should apply. The sale was made pursuant to a contractual provision in a guaranty which is not a Uniform Commercial Code secured transaction.

tention to sell the Challenger after April 9, 1976 in Plaintiff's March 25, 1976 demand letter; (2) "Union Oil was the most logical, if not the only, buyer" for the Challenger since "there were no potential buyers in Hawaii for the [Challenger], at least at a price in excess of $20,000"; and (3) the price of $20,000 was reasonable due to the age, condition, and depreciated value of the Challenger. Also, we are not convinced that a mistake has been made regarding those findings.

## II.

In the prior appeal of this case, we affirmed the part of the judgment awarding $23,853.84 on the Lease 2650 claim and reversed the other part of the judgment awarding $54,224.19 on the Lease 2571 claim. However, we vacated the award of interest, costs, and attorney's fees since those items were not apportioned between the Lease 2650 and Lease 2571 claims. *Hawaii Leasing v. Klein,* 4 Haw. App. 1, 658 P.2d 343 (1983).

Defendants assert that Plaintiff presented no evidence below regarding costs, attorney's fees, and the allocation of those items between the two claims.[6] Plaintiff's response is that since it has prevailed on both claims, the allocation issue is now moot.

The matter is not moot since Plaintiff is not entitled to an award of costs and attorney's fees attributable to the summary judgment which was reversed in the prior appeal. Moreover, the record is devoid of any bill of costs, other than $417.98 of the total costs of $1,613.10 itemized in an affidavit filed on January 16, 1984. Also lacking is evidence to show that the attorney's fees were "reasonably and necessarily incurred."[7] *Jenkins v. Wise,* 58 Haw. 592, 604, 574 P.2d 1337, 1345 (1978). *See also* HRS § 607-17 (1976); *Sharp v. Hui Wahine, Inc.,* 49 Haw. 241, 413 P.2d 242 (1966).

---

[6] Defendants do not challenge the interest items since they can be mathematically calculated.

[7] The record includes the affidavit of Robert A. Rowan, Esq., which states, *inter alia,* "Attorney's fees actually incurred by [Plaintiff] exceed $65,000.00." Record Vol. 3 at 212. Exhibit 70 in evidence is Plaintiff's ledger sheet entitled "Litigation" for Lease No. 2571 with entries of attorney's fees billed. However, neither the affidavit nor the exhibit includes itemizations of the time and types of legal services rendered.

The attorney's fees reasonably and necessarily incurred by Plaintiff may actually exceed the awarded amounts which were the maximum awardable under HRS § 607-17.[8] However, based on the state of the record, we are constrained to hold that the trial court abused its discretion in its award of costs and attorney's fees.

### III.

We affirm the judgment, except the award of costs and attorney's fees which are vacated and set aside.

Remanded for redetermination of the award of costs and reasonable attorney's fees.

*Merle H. Horwitz (John A. Chanin* with him on the briefs; *The Law Offices of John A. Chanin,* of counsel) for defendants-appellants.

*Robert A. Rowan (David Schulmeister* with him on the brief; *Cades Schutte Fleming & Wright,* of counsel) for plaintiff-appellee.

---

[8] Under HRS § 607-17 (1976), the attorney's fees awarded may not exceed 25% of the amount sued upon plus accumulated interest to the time of judgment. *Lennen & Newell, Inc. v. Clark Enterprises, Inc.,* 51 Haw. 233, 456 P.2d 231 (1969).