923 P.2d 903

**Darlene K. TAKAYAMA,**
**Plaintiff–Appellant,**

**and**

**Richard H. Takayama, Plaintiff,**

v.

**KAISER FOUNDATION HOSPITAL; Kaiser–Permanente Medical Care Program; Hawai'i Permanente Medical Group, Inc.; Kaiser Foundation Health Plan, Inc.; Bernard Robinson, M.D., Defendants–Appellees,**

**and**

**John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Doe Trusts 1–10; Doe "Non–Profit" Organizations 1–10; and Roe Governmental Agencies 1–10, Defendants.**

**No. 19237.**

Supreme Court of Hawai'i.

Aug. 30, 1996.

----

1.  I should add that I have no idea how a majority of the court would resolve the question.

**488**

Jan M. Weinberg and Roy J. Bell of Weinberg & Bell, Honolulu, for plaintiff-appellant Darlene K. Takayama.

George W. Playdon, Jr. and M. Lorena Uy of Reinwald, O'Connor, Marrack, Hoskins & Playdon, Honolulu, for defendants-appellees Kaiser Foundation Hospital, Kaiser-Permanente Medical Care Program, Hawaii Permanente Medical Group, Inc., Kaiser Foundation Health Plan, Inc. and Bernard Robinson, M.D.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Following a jury trial in this medical malpractice case, plaintiff-appellant Darlene K. Takayama appeals from the judgment entered in favor of defendants-appellees Kaiser Foundation Hospital, Kaiser–Permanente Medical Care Program, Hawai'i Permanente Medical Group, Kaiser Foundation Health Plan and Bernard Robinson, M.D. [hereinafter, collectively, Kaiser]. On appeal, Takayama argues that the trial court: (1) abused its discretion in granting Kaiser's motion in limine regarding rebuttal evidence and in refusing to permit Takayama to present certain rebuttal evidence; (2) abused its discretion in denying Takayama's motion in limine to exclude evidence or argument by Kaiser on the issue of causation of Takayama's injuries; (3) erred in denying Takayama's motion for a directed verdict on the issue of causation of Takayama's injuries; and (4) erred in denying Takayama's motion for judgment notwithstanding the verdict and/or for a new trial. For the following reasons, we affirm.

## I. BACKGROUND

In 1985, at the age of thirty-eight, Takayama began experiencing recurrent headaches, increasing stiffness and pain in her neck, and difficulty swallowing. She sought medical advice and treatment at Kaiser. After being initially treated by another Kaiser physician, Takayama was treated by Meredith Olds, M.D.,[1] a Kaiser neurosurgeon. On November 25, 1985, Dr. Olds diagnosed Takayama

---

1. Dr. Olds is not a party to this suit.

as suffering from Diffuse Idiopathic Skeletal Hyperostosis, or DISH, a congenital condition that causes excess bone to develop on the outer surface of the spine. Dr. Olds noted that Takayama's neck was very restricted in motion and suspected that Takayama would eventually need to undergo a cervical decompression procedure.

In November 1986, Dr. Olds consulted with Dr. Robinson, the chief of the neuroscience department at Kaiser, on Takayama's case. Dr. Robinson examined Takayama and determined that, in addition to the DISH condition, Takayama was also suffering from one of the most severe cases he had seen to that date of a condition called "OPLL," or Ossified Posterior Longitudinal Ligament.

OPLL is a relatively rare disease process whereby the posterior longitudinal ligament, a normally thin, leathery structure that runs along the inside of the spinal canal, slowly "ossifies," or turns to bone, thereby occupying more space in the spinal canal and causing "stenosis," a narrowing of the spinal canal, which, in turn, may cause compression of the spinal cord.

Because of the severity of Takayama's OPLL condition, Dr. Robinson surmised that, without an operation to alleviate the spinal compression caused by the OPLL, Takayama would be at dire risk of death or severe neurologic compromise from as little as a simple slip and fall or some other minor trauma.

Taking into account Takayama's physical and medical condition and history, including diabetes mellitus,[2] bipolar manic-depressive disorder,[3] high blood pressure,[4] and obesity,[5] Dr. Robinson formulated a two-stage surgical plan to treat Takayama's OPLL condition consisting of two separate surgical procedures. The first procedure, a "posterior fusion and bone graft," would strengthen and stabilize Takayama's neck by the grafting of bone tissue harvested from Takayama's rib onto Takayama's vertebrae at the C2, C3, and C4 levels. The second procedure, a series of "anterior cervical corpectomies," was to be performed several weeks after the first procedure and would involve: (1) removal of the vertebral bodies of multiple levels of Takayama's spine; (2) removal of the abnormal bone growth on the external anterior surface of the spine due to the DISH condition; (3) removal of the OPLL development inside the spinal canal; and (4) the grafting of bone harvested from Takayama's leg onto the anterior external surface of Takayama's spinal column to strengthen the spine. Dr. Robinson described the first procedure as a "staging" procedure for the second procedure and, of the two surgeries that were to be performed on Takayama, considered the first procedure to be far safer than the second.

On August 11, 1987, Takayama underwent the first procedure. After she was anesthetized, Dr. Robinson placed Takayama in a prone position on her stomach with her head secured in a Mayfield head clamp, a device

2. Diabetes mellitus is

a metabolic disorder in which the ability to oxidize carbohydrates is more of less lost, usually resulting from faulty pancreatic activity with consequent disturbance of the normal insulin mechanism. This condition produces hyperglycemia (abnormal increase of glucose in the blood) and may result in acidosis and coma. The ravages of this insidious disease may affect other parts and functions of the body and may result in chronic complications, including neuropathy (disorder of the nervous system), retinopathy (degenerative disease of the retina), nephropathy (disease of the kidneys), and generalized changes in large and small blood vessels.

*The Sloane–Dorland Annotated Medical–Legal Dictionary* 198 (1987).

3. A manic-depressive disorder is defined as

a major affective disorder characterized by severe mood swings and a tendency to remission and recurrence. It is seen in a manic type, consisting of manic episodes characterized by excessive elation, irritability, talkativeness, flight of ideas, and psychomotor overactivity; in a depressed or unipolar type, consisting of depressive episodes characterized by severely depressed mood and by mental and motor retardation that may progress to stupor; and in a circular or bipolar type, consisting of at least one depressive episode and a manic episode. *Id.* at 591 (emphases omitted).

4. Takayama was medicated for high blood pressure.

5. At the time of her operation in 1987, Takayama was five feet nine and one-half inches tall and weighed more than 280 pounds.

that holds the head stable for surgery by the insertion of three pins through the scalp and slightly into the skull. As Dr. Robinson exposed Takayama's spinal column, John Graham, M.D., another Kaiser neurosurgeon assisting Dr. Robinson, harvested the rib bone for the graft.

Dr. Robinson prepared the C3, C4, and C5 vertebrae for the grafting procedure by "roughing up" the surface of the vertebrae with a power drill. He drilled six "laminotomies," or holes, one each on the left and right sides of Takayama's three problem vertebrae. Drs. Robinson and Graham then passed eighteen-gauge stainless steel sublaminar wires through the laminotomies and between the vertebral laminal surface and the underlying "dura," the outer protective sheeting tissue of the spinal canal, to form loops. The sublaminar wire loops were then used to secure the bone graft to the vertebrae to facilitate bone fusion and to add strength to the spine.

Dr. Robinson testified, both in his deposition and at trial, that the first procedure went well. However, in the recovery room shortly after the completion of the surgery, Dr. Robinson discovered that (1) Takayama was quadriparetic [6] in that she was significantly weak in all four of her limbs and (2) the Mayfield head clamp used to stabilize Takayama's head had slipped, causing a laceration on Takayama's scalp approximately a centimeter long.

After attempting to restore function to Takayama's limbs with medication, Dr. Robinson ordered Takayama back into the operating room, where she was again anesthetized. To save time, Dr. Robinson secured Takayama's head with a horseshoe clamp instead of a Mayfield head clamp. Dr. Robinson then exposed the spinal column and removed the sublaminar wires. After removal of the wires, Dr. Robinson secured the bone grafts to the spine with a flap of muscle tissue.

Takayama's condition improved after the second surgery, although she remained quadriparetic. Takayama remained hospitalized at Kaiser for the next seven months. Subsequent examination indicated that the muscle tissue flap technique, employed by Dr. Robinson in the second surgery, was successful in securing the bone grafts to Takayama's spine and that the grafts eventually fused to the vertebrae. Without the sublaminar wiring, however, the fusion process took longer.

On December 1, 1987, Takayama underwent the second half of Dr. Robinson's surgical plan. This complex and difficult procedure involved extracting a lower incisor tooth, splitting Takayama's jaw down the midline, cutting around her tongue and the base of her mouth, removing a portion of her thyroid gland, and opening the back of her throat in order to expose the uppermost portion of the spine. The entire procedure lasted more than twenty-four hours and involved four surgeons and a physician's assistant working in shifts. Takayama remained quadriparetic after the second surgery.

After complying with the requirements of Hawai'i Revised Statutes (HRS) chapter 671, Takayama filed a complaint against Kaiser in the First Circuit Court on August 6, 1991, alleging, *inter alia*,[7] medical negligence on the part of Dr. Robinson in Takayama's treatment. After discovery was completed and a series of pretrial motions were resolved,[8] a jury trial began on January 3, 1995.

Takayama's principal theory of medical negligence was that Dr. Robinson breached the applicable standard of care by utilizing a sublaminar wiring staging procedure on Takayama when Takayama's spinal canal was severely stenosed. As part of its case-in-chief at trial, Takayama called Henry Bohl-

---

**6.** The terms "quadriparetic" and "quadriplegic" both describe conditions involving a degree of paralysis in all four limbs. Dr. John Graham testified in his deposition that the term "quadriparetic" describes an "incomplete condition," whereas "quadriplegic," or "quadriplegia" describes a condition where a patient has "absolutely no function."

**7.** The three-count complaint also alleged claims for relief based on respondeat superior and Richard Takayama's loss of consortium, services, comfort, happiness, society and companionship.

**8.** None of the pretrial motions, other than the motions in limine previously listed, are at issue in the present appeal.

man, M.D., a prominent orthopedic surgeon, as an expert witness. Dr. Bohlman opined that, because Takayama's OPLL condition was so severe and her spinal canal so stenosed, there was no room to insert sublaminar wiring into Takayama's spinal canal. Dr. Bohlman testified:

Q. [By Takayama's counsel] Then do you have an opinion within—to a degree of reasonable medical probability as to whether or not the insertion of sublaminal wires by Dr. Robinson in the first surgery on August 11, 1987 complied with the standard of care?

A. Yes.

Q. And what is your opinion?

A. I think that was absolutely below the standard of care based on what was obvious on the studies before the surgery.

I mean, there just was absolutely no room to put any instruments or wire of any type into the spinal canal where the spinal cord was flattened down to six millimeters. I mean, you have to realize that the normal spinal canal is usually eighteen millimeters or about three quarters of an inch, and this was only six millimeters of room with the spinal cord squished and that's only about a quarter of an inch. So I think this was the wrong thing to do and was not the standard of—not the standard of care.

Q. With respect to Dr. Robinson's decision to do a posterior fusion as the first part of a two stage procedure, do you have an opinion to a degree of reasonable medical probability as to whether that first posterior fusion was a reasonable and prudent procedure that complied with the standard of care?

A. If there was a different type of posterior fusion done, I wouldn't have a great argument against that, if he felt that tremendous instability was going to occur. It's the technique that was used to do it. I don't think it was necessary.

Q. And why not, Doctor?

A. Well, I think [Takayama] could have been decompressed from the front with a less extensive procedure that did not go through the mouth and do all of that, and just do a standard anterior decompression and fusion without running any great risk to her spinal cord.

Consistent with its pretrial position and Drs. Robinson's and Graham's deposition testimony, Kaiser's principal defense at trial was that Dr. Robinson's treatment of Takayama did not fall below the requisite standard of care, specifically because Dr. Robinson had placed the sublaminar wiring "far laterally" on each of Takayama's three problem vertebrae, and, therefore, the sublaminar wires did not intrude into the spinal canal. Anticipating this defense, however, Dr. Bohlman testified during Takayama' case-in-chief that, based on his review of image no. 16 of the post-operative CAT [9] scan films of Takayama's spine taken in 1988 (Exhibit 4L)— after all of the procedures performed on her were completed—Dr. Robinson's testimony that he had placed the laminotomies "far laterally" was also suspect. Dr. Bohlman testified:

Q. [By Takayama's counsel] Do you have an opinion to a degree of reasonable medical probability as to whether Dr. Robinson's version of where he made the laminotomy notches is correct?

A. Yes, I do.

Q. And what is your opinion?

A. I don't think they were this far laterally or this far out to the side.

Q. And on what do you base that opinion, Dr. Bohlman?

A. I think on the post operative CT scan it looks like the notches are much closer to the spinous process. I mean, these notches are way off to the side and—and by the way, here on this middle image of the—this is the myelogram and CT scan and this is the spinal cord here which is absolutely pushed up against the lamina and this is all the OPLL. I can't conceive of getting a wire through here, number one, and there's just—I mean, there's no

---

9. The term "CAT" or "CT" scan refers to computerized axial tomography, a diagnostic procedure also known as roentgenography. Roentgenography is defined as "the making of a record (roent-genogram) of internal structures of the body by passage of x-rays through the body to act on specially sensitized film." *The Sloane–Dorland Annotated Medical Legal Dictionary* 622 (1987).

room on either side even if they're this far out to the side.

The other thing that you don't see on this diagram, these little—we call these little frame intertunnels, this is where the nerve roots go out of the spinal canal which go down to the arms which you don't really see or appreciate on this diagram. So they fill this space right here and somewhere here. I think based on the—the 1988 CT scan that was done to I think assess the extent of decompression, the notches are further towards the midline.

On cross-examination, however, Dr. Bohlman testified that he believed that Exhibit 4L did not depict the C6 to T1 level of Takayama's spine as labeled by Kaiser, but rather depicted the C3 level. Dr. Bohlman testified:

Q. [By Kaiser's counsel] Could you point out to the jury where that posterior fusion is shown on Exhibit 4L?

A. I don't see any fusion on these cuts, it's probably absorbed, I don't see it here. I see fragments on some of the other cuts.

Q. You would agree that you can't see any fusion mass on this—or bone grafts on these photographs, can you?

A. That may have—I agree, that may have partially absorbed or be [sic] incorporated in the bone here at this point in time, but you usually don't see Particulate fusion mass five months after it's done, it's usually solidified at that point.

Q. Does the indication C6, T1 have any significance on these films?

A. I don't think, based on the—what's called a topogram, this is correct. I mean the C7, T1 is usually the span of what they're scanning, this is based on my review. This is higher level, this is a C3.

Q. Well, if it's C3 why wouldn't we be seeing the fusion that was placed there five months earlier?

A. As I mentioned, in five months it's incorporated and fused.

Q. Well then, shouldn't it be shown on some sort of bone window?

A. No, not necessarily. It may be incorporated right here, right in there.

Q. You're showing a soft tissue window?

A. No, this is bone here and here, that may be—when I say incorporate, I mean bone graft heals, you can put little pieces in and bone graft heals like a fracture, it forms a solid mass. Certainly over five months it may all smooth off.

Q. Or it may be that these films are exactly what it shows from C6 to T1?

A. I don't think it's that low based on the other—I've gone carefully through all these cuts, unless you have the anterior graft in here.

Q. Thank you, sir.

If, Doctor, [Exhibit] 4L, the CT scan we just looked at was in fact demonstrating cervical levels down at the C6 level, there was no wiring that ever occurred at that level, isn't that right, sir?

A. I think this was demonstrating C3 as I mentioned, but there was no wire below C3.

Q. All right.

A. I mean except between C3 and C4.

Takayama thereafter completed her case-in-chief. During Kaiser's case-in-chief, Dr. Graham testified on cross-examination by Takayama's counsel that Exhibit 4L did not depict the C3 level, as testified to by Dr. Bohlman, but, as evinced by the anatomical "landmarks" visible in the scan, Exhibit 4L was not mislabeled and did depict the C6 level. Dr. Graham testified:

Q. [By Kaiser's counsel] Have you looked at [Exhibit 4L]?

A. Again, I looked at all the CT's that were done on 20 January, so yes.

Q. Now, Dr. Bohlman testified when he looked at [Exhibit 4L] that it showed C–3, and that it showed and he could view the laminotomy notches on this 1988 CAT scan, and it shows that the laminotomy notches were not made far laterally, where you and Dr. Robinson say they were, but they were made of [sic] closer to the cord than you've indicated, can you see that on the film?

A. No, I cannot.

Q. You can't see it at all?

A. No.

Q. Do you know whether that film shows C–3?

A. Uh, without—usually you get a to-pogram that gives you a diagram of where the cuts were taken. I don't think it shows C–3 based on the fact that I don't see any fusion back here, and we know that the fusion from C–1 to C–4 was solid, and so therefore, on this level this level and this level you'd expect to see back here you'd expect to see the rib graft fusions, and we don't see that.

We do see the fusion that was done anteriorly from the fibula, which you would expect to see cause it went all the way down to C–7, but I can't say looking at this that this is C–3 because I don't see any posterior fusion.

Q. So you don't see that and you don't know whether that's C–3 or not?

A. I don't think this is C–3, no.

Q. Okay. If you [sic] I were to hand you—

A. Can I, one other thing.

Q. Sure.

A. This is the thyroid cartilage here which is this part of your voice box, okay, and this usually corresponds to an area around C–5, C–6. In fact we use that as a landmark to help us figure out where to make our incision sometimes.

So again, you can see the cartilage and so this is probably lower than C–3 because the thyroid cartilage ends probably around upper level of C–6 or C–5. I'd have to look at a detailed model here, but I think that [sic] just rough.

Q. Surgery?

A. Landmarks, we believe this is below C–3.

Q. You don't think this is C–3?

A. No.

Dr. Graham went on to opine that, based on: (1) his examination of the films that he believed actually depicted Takayama's C3 level; (2) the limitations of the CAT scan imaging technology available at the time the images were taken; and (3) the extent of the bone fusion, it was impossible to determine where the laminotomies were made. Dr. Graham testified:

Q. [By Takayama's counsel] Okay. And when you looked at that image, it's your testimony that there's no confirmation from that film as to where the laminotomy notches were placed?

A. That's correct, it would all be guess-work.

Q. In other words, the only thing that we have if you were to look at all the films that were taken of Mrs. Takayama, that you know of the only confirmation at that we have as to where these laminotomy notches were supposedly placed is your testimony and Dr. Robinson's testimony?

A. That's correct.

Q. But that if there were a film that could demonstrate that that would certainly be more·objective than the testimony?

A. If you're looking at people giving opinions under oath as not being objective?

Q. I'm suggesting that, yes.

A. So you're implying that I'm not telling the truth?

Q. Exactly.

A. I see.

Q. Exactly, yes.

A. I would say that I'm under oath, and I am telling the truth, so I disagree.

With respect to determining where the laminotomy notches would be placed in any event, Dr. Graham further testified:

Q. [By Takayama's counsel] I asked you whether films, have you ever reviewed films posterior that show laminotomy notches?

A. I've reviewed post-operative [sic] numerous time [sic].

Q. And they show the laminotomy notches, don't they? Never?

A. No.

Q. Never?

A. I've never been able to identify one.

Q. So if a neurosurgeon came into court and testified that in a, a review of films he could show exactly where the laminotomy notches were placed by you and Dr. Robinson that would be impossible?

A. I don't say that it would be impossible, but I'm saying but with the presence in this particular case, where there is fusion in place that we've already documented on plane X-rays are that there's bone growing back there.

I, I'd say it would be very difficult to say without doubt that very [sic] this is where the laminotomy notches are.

Q. And more likely than not?

A. You'd have to again I'd have to see.

Q. And you haven't seen any dated films, have you?

A. I haven't seen any recent ones, no, sir.

Thereafter, on January 16, 1995, while trial was on-going, Takayama underwent another CAT scan (the new CAT scan). The new CAT scan was ordered and reviewed by Maurice Nicholson, M.D., a Honolulu neurosurgeon who had testified in Takayama's case-in-chief.[10] On January 18, 1995, Takayama's counsel informed the trial court and opposing counsel that Dr. Nicholson would be recalled to testify on rebuttal. The court and counsel were further advised that Dr. Nicholson would testify that the new CAT scan depicted the location of the laminotomy notches in Takayama's spine.

Kaiser moved in limine to block the introduction of the new CAT scan and Dr. Nicholson's rebuttal testimony. The trial court granted the motion, stating that:

[T]here's no chance to find out [if anyone is lying] and as a matter of policy of administration of justice, I'm not going to allow you folks to do discovery during a trial to find out[.] [Y]ou can't do that ... in any event, the basic point is you come into trial you say is so.

You should anticipate that they're going to say ain't so, and in order to show that they're wrong in saying ain't so, maybe you should have done this test regardless of the medical risks and lack of medical benefits[.] [I]f that is indeed true, it

seems that this is medically beneficial to [Takayama's] present condition.

In any event I don't know, okay. I'm not a physician, but the point is you should have done it earlier if you're going to do, you were on notice that they were going to say ain't so.

The trial court then allowed Takayama's counsel to make an offer of proof. Takayama's counsel stated:

If Dr. Maurice Nicholson were called to the witness stand as a rebuttal witness he would testify to the following:

That he ordered CAT scan films to be taken of Mrs. Takayama's, Plaintiff's cervical and thoracic spine on January 16, 1995 at Queen's Medical Center, that those films were taken at and pursuant to his direction that he then met and consulted with a very competent board certified radiologist with a sub-specialty, Mr. Furo, radiology, Dr. Steven Holmes and that the films which were taken and Dr. Holmes' report identified as Exhibit 45A, demonstrated that the laminotomy notches or the partial laminectomies as they are otherwise called at C-3 were cuts at or near the mid-line and are demonstrated in particularly films 19 and 20, the CAT scan films.

And that those locations definitively established the locations of the laminotomy notches made by Doctors Robinson and/or Graham on August 12, 12, [sic, 11] 1987, and that there's absolutely no evidence in the films that laminotomy notches were made far laterally as testified to in this trial by Doctors Robinson and Graham.

And that based on his review of the films and his own interpretation of CT scans which he does on a day-to-day basis in addition to his consultation with Dr. Holmes, Dr. Nicholson would testify that the location of the sublaminar wires were placed on Mrs. Takayama's spine on August 11, 1987 at C-3 were close to the mid-line or at or about the mid-line of C-3, and that is where the sublaminar wires were insert[ed], and that, Your Honor, is the

---

10. Although Takayama underwent the CAT scan on January 16, 1995, Dr. Nicholson's affidavit indicates that a paralegal from Takayama's counsel's office had approached Dr. Nicholson regarding obtaining a second CAT scan on Takayama as early as the morning of January 10, 1995, two days prior to the close of Takayama's case-in-chief.

offer of proof with respect to Dr. Nicholson, were he to have testified as a rebuttal witness.

At the close of Kaiser's case, Takayama moved for a directed verdict on, *inter alia,* the issue of legal causation of Takayama's injuries, which the trial court denied. The jury thereafter returned a verdict in favor of Kaiser and against Takayama, finding that Dr. Robinson was not negligent in his treatment of Takayama. This timely appeal followed.

## II. *STANDARDS OF REVIEW*

"The introduction of evidence in rebuttal and in surrebuttal is a matter within the discretion of the trial court and appellate courts will not interfere absent abuse thereof." *Yorita v. Okumoto,* 3 Haw.App. 148, 156, 643 P.2d 820, 826 (1982) (footnote omitted) (citing *Sasaki v. Nakamura,* 26 Haw. 178 (1921); *Macfarlane v. Wilder,* 11 Haw. 673 (1899)).

It is well settled that denials of directed verdict or [judgment notwithstanding the verdict ( ]JNOV[ ) ] motions are reviewed *de novo.* Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.

*Carr v. Strode,* 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995) (citations, brackets, and internal quotation marks omitted).

Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion. An abuse of discretion occurs where the trial court has clearly exceeded the bounds

of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant. Unlike motions for a directed verdict or a JNOV, the movant need not, on a motion for new trial, convince the court to rule that no substantial evidence supports its opponent's case, but only that the verdict rendered for its opponent is against the manifest weight of the evidence.

*Id.* at 488, 904 P.2d at 502 (citations and internal quotation marks omitted).

## III. *DISCUSSION*

A. *The Trial Court Did Not Commit an Abuse of Discretion in Granting Kaiser's Motion In Limine to Exclude the Proffered Testimony of Dr. Nicholson and the New CAT Scan's Imaging Film Results.*

Takayama contends that the trial court abused its discretion in granting Kaiser's motion in limine to exclude the imaging film results of Takayama's new CAT scan and Dr. Nicholson's corresponding testimony regarding the new CAT scan results because: (1) Takayama was not obliged to rebut Kaiser's defense that Dr. Robinson placed the laminotomies far laterally in Takayama's spine in their case-in-chief; (2) the evidence was not used as part of a strategic plan or tactic to attempt to gain an unfair advantage at trial; (3) the trial proceeded ahead of schedule; (4) the CAT scan procedure was nontherapeutic, invasive, potentially risky, and painful; (5) the reports and films were transmitted to Kaiser's counsel promptly; and (6) Dr. Nicholson was available in Honolulu for deposition by Kaiser's counsel.

Kaiser retorts by asserting that the trial court properly excluded the evidence because: (1) the evidence should have been introduced as part of Takayama's case-in-chief; (2) Takayama was on notice of its defense, through the deposition testimony of Drs. Robinson and Graham, that the use of sublaminar wiring during the posterior fusion procedure was proper, safe, and consistent with the standard of care because Drs. Robinson and Graham had placed the laminotomies far laterally on Takayama's spine; and (3) Dr. Nicholson's testimony was not proper

rebuttal testimony insofar as Takayama's counsel had approached Dr. Nicholson regarding scheduling a CAT scan on Takayama before Takayama had rested her case-in-chief. We hold that the trial court did not abuse its discretion in excluding Takayama's proffered rebuttal evidence for two principal reasons.

1. *The Party Upon Whom the Affirmative of an Issue Devolves is Bound to Give All Available Evidence in Support of the Issue in the First Instance and Will Not be Permitted to Hold Back Evidence Confirmatory of His or Her Case And Then Offer It on Rebuttal.*

■ First, as a general rule, a party is bound to give all available evidence in support of an issue in the first instance it is raised at trial and will not be permitted to hold back evidence confirmatory of its position to offer on rebuttal. In *Yorita*, a medical malpractice case, the Intermediate Court of Appeals (ICA) had occasion to examine the propriety of a trial court's decision to allow plaintiffs to present the expert testimony of a pathologist on rebuttal. Holding that the trial court did not abuse its discretion in allowing the plaintiff to present the pathologist's testimony on rebuttal but refusing to allow the defense to present three surrebuttal witnesses to confirm its witnesses, the ICA stated that:

To determine whether there has been an abuse of discretion, we must examine the sequence of the trial. Plaintiffs' evidence against the hospital asserted a claim of negligence based on the following events in the following sequence: (1) respiratory arrest, (2) failure to discover the respiratory arrest because of a failure to monitor, (3) cardiac arrest, (4) failure to discover the cardiac arrest because of a failure to monitor, (5) anoxia [lack of oxygen], (6) necrosis [death of tissue] of the brain, (7) discovery of the respiratory and cardiac arrests too late to prevent anoxia and necrosis of the brain, and (8) necrosis of the brain ultimately causing the primary cause of death.

Hilo Hospital's evidence attempted to prove that a hypertrophic [diseased enlargement] cardiomyopathy [disorder of the heart muscle] caused everything else, and even if it did not cause everything else, then its presence limited [the decedent's] life expectancy to a maximum of ten years.

Plaintiffs' rebuttal witness contradicted defendant's expert pathologist witnesses by testifying "that based on the—the pathological findings contained on the slides and from the autopsy report that [the decedent] was not suffering from the heart disease that the defense claims him to have been suffering from."

Defendants attempted to call three surrebuttal witnesses to confirm its witnesses and to contradict plaintiffs' rebuttal witness, but the trial judge would not allow them to do so.

We find no abuse of discretion in this situation. *The general rule is that "the party upon whom the affirmative of an issue devolves is bound to give all his [or her] evidence in support of the issue in the first instance, and will not be permitted to hold back part of his [or her] evidence confirmatory of his [or her] case and then offer it on rebuttal."* 75 Am.Jur.2d *Trial*, § 151 (1974) (footnote omitted). *However, the rule is not so easily applied when the evidence is negative of a potential defense.* Here, we readily understand why plaintiffs did not attempt to prove the negative of Hilo Hospital's heart disease defense during their case in chief and why the trial judge allowed them to do so on rebuttal. We have difficulty understanding why Hilo Hospital would put on two expert witnesses ... to prove the validity of its heart disease defense but would, without the trial court's prior approval, reserve three additional expert witnesses on the same issue for surrebuttal, and we readily understand why the trial judge would not allow it to do so.

*Yorita*, 3 Haw.App. at 156–57, 643 P.2d at 827 (some brackets in original and some brackets added) (emphasis added). Takayama argues that, similar to the situation in *Yorita*, the general rule that all evidence confirmatory of a case should be given in the first instance it is raised—in this case, during

Takayama's case-in-chief—should not apply to the rebuttal evidence in the present case because the evidence "is negative of a potential defense." We disagree.

■ Three principles are discernible from the above-quoted passage from *Yorita.* First, as previously noted, as a general proposition, "the party upon whom the affirmative of an issue devolves is bound to give all his [or her] evidence in support of the issue in the first instance, and will not be permitted to hold back part of his [or her] evidence confirmatory of his [or her] case and then offer it on rebuttal." *Id.* at 157, 643 P.2d at 827. In other words, in the interests of expediency and limiting surprise, all evidence in support of a party's position should be presented when the issue it addresses is first presented.

■ Second, this general rule does not necessarily apply where the evidence sought to be presented on rebuttal is "negative of a potential defense," even if the evidence is also confirmatory of an affirmative position upon which the party seeking to present the evidence bears the burden of proof. As the ICA noted in *Yorita,* it may be readily understandable as a general matter of trial strategy that a party would choose not to seek to reveal, highlight, or refute a contrary position until the contrary position has actually been taken by the opposition.

■ Finally, however, as the Missouri Court of Appeals has succinctly noted, although a party is not required "to call, during his [or her] case in chief, every conceivable witness who might contradict a potential defense witness[,]" *Chrisler v. Holiday Valley, Inc.,* 580 S.W.2d 309, 314 (Mo.Ct.App. 1979), it is also generally true that

> [a] party cannot, as a matter of right, offer in rebuttal evidence which was proper or should have been introduced in chief, even though it tends to contradict the adverse party's evidence and, while the court may in its discretion admit such evidence, it may and generally should decline to admit the evidence.

*Gassen v. Woy,* 785 S.W.2d 601, 605 (Mo.Ct. App.1990) (citations omitted).

This principle is evident in *Yorita* in the ICA's affirmance of the trial court's allowing the plaintiff to present a pathologist's testimony to rebut the defense raised for the first time in the defense's case-in-chief, and yet refusing to allow the defense to present three expert witnesses on surrebuttal where it had presented two expert witnesses to testify regarding the same issue during its case-in-chief.

■ Thus, as in the present case, if the evidence sought to be presented on rebuttal is both confirmatory of a party's case and negative of a potential defense, and, if the party seeking to present evidence on rebuttal has previously broached the issue of the potential defense during its case-in-chief and presented other evidence refuting the potential defense, it is not an abuse of discretion for the trial court to disallow the presentation of the new evidence sought to be introduced on rebuttal, despite the fact that the evidence rebuts the position taken by the opposition immediately preceding it. In other words, despite the fact that the defense's assertion that the laminotomies were placed far laterally in Takayama's vertebra would have been refuted, if the had jury had resolved the factual issue of the physical location of the laminotomies in Takayama's favor, it remained Takayama's burden to establish the physical location of the laminotomies in her spine. Therefore, she was obligated "to give all [her] evidence in support of the issue in the first instance, and will not be permitted to hold back part of [her] evidence confirmatory of [her] case and then offer it on rebuttal," *Yorita,* 3 Haw.App. at 157, 643 P.2d at 827 (emphasis added), or to refrain from resting her case until all the evidence confirmatory of her position was presented.

2. *Mere Weaknesses in Proof Adduced During a Party's Case–in–Chief Do Not Entitle the Party to Present Evidence on Rebuttal in Support of a Position Taken During the Party's Case–in–Chief.*

■ Second, in the present case, the factual issues of where Dr. Robinson placed the laminotomies in Takayama's spine and, more specifically, the level of Takayama's spine

depicted in Exhibit 4L, was the subject of conflicting testimony. In view of the jury's verdict, the jury apparently considered Dr. Bohlman's testimony to be weaker than that of Dr. Graham. Dr. Bohlman testified during Takayama's case-in-chief regarding the placement of the laminotomies in Takayama's vertebrae and opined during aggressive cross-examination by Kaiser's counsel that, based on Dr. Bohlman's conclusion that Exhibit 4L was mislabeled, the laminotomies were not placed far laterally, as asserted by Dr. Robinson, but rather were placed close to the midline of each vertebra. During Kaiser's case-in-chief, Dr. Graham testified that he was present at the surgery in question, placed some of the laminotomies himself, and, perhaps most importantly, opined that Exhibit 4L depicted Takayama's C6 level vertebra and was not mislabeled as asserted by Dr. Bohlman.

Therefore, viewing the sequence of the trial, as we must, *see Yorita*, 3 Haw.App. at 156, 643 P.2d at 827, the perceived necessity for the introduction of rebuttal evidence stemmed from the need to bolster insufficiencies in Dr. Bohlman's testimony, as well as from the need to impeach Dr. Graham's testimony.

Contrary to Takayama's assertions, whether: (1) the trial proceeded ahead of schedule; (2) the reports and films were transmitted to Kaiser's counsel promptly; (3) Dr. Nicholson was available in Honolulu for deposition by Kaiser's counsel; or (4) the nontherapeutic, invasive procedure was potentially risky and painful, is not outcome dispositive. In view of the facts that: (1) Takayama was on notice, through the deposition testimony of both Drs. Robinson and Graham, of the defense's position that Drs. Robinson and Graham placed the laminotomies far laterally in Takayama's spine; (2) both Drs. Robinson's and Graham's testimony at trial was consistent with the positions taken in their deposition testimony regarding the placement of the laminotomies; (3) Dr. Bohlman, Takayama's expert, testified not only as to whether Dr. Robinson's use of the sublaminar wiring technique during the initial posterior fusion procedure comported with the standard of care, but also testified regarding the placement of the laminotomies in Takayama's spine; and (4) Takayama rested her case-in-chief without presenting the new evidence, despite the fact that efforts were already being made two days prior to the close of their case-in-chief to obtain the new evidence, we hold that the record does not support a conclusion that the trial court abused its discretion in granting Kaiser's motion in limine to exclude the presentation of the results of the new CAT scan of Takayama's spine and Dr. Nicholson's corresponding testimony.

B. *Assuming Arguendo That the Trial Court Erred in Denying Takayamas' Motion for Directed Verdict on the Issue of Causation and/or Takayama's Motion for JNOV or New Trial, Any Error Would be Harmless in View of Our Holding Regarding the Trial Court's Ruling on Rebuttal Evidence and the Absence of Any Other Arguments Challenging the Jury's Finding that Dr. Robinson Was Not Negligent.*

Takayama next argues that the trial court erred in denying her motion for directed verdict on the issue of causation and/or her motion for JNOV or new trial. However, even if the circuit court had committed any error associated with its denial of both motions, any such error would be harmless in view of our affirmance of the trial court's ruling regarding the introduction of Takayama's proffered rebuttal evidence and the fact that Takayama does not otherwise challenge the propriety of the jury's finding that Dr. Robinson was not negligent in his treatment of Takayama.

■ In order to prevail on her negligence claim, Takayama was required to prove all of the necessary elements:

(1) A duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks;

(2) A failure on the defendant's part to conform to the standard required: a breach of the duty;

(3) A reasonably close causal connection between the conduct and the resulting injury[;] and

(4) Actual loss or damage resulting to the interests of another.

*Knodle v. Waikiki Gateway Hotel, Inc.,* 69 Haw. 376, 385, 742 P.2d 377, 383 (1987) (some brackets omitted and some brackets added) (citations omitted). Moreover, "[i]t is well settled that negligence and causation are independent legal requirements[ ] and that a finding of negligence does not automatically imply causation." *Craft v. Peebles,* 78 Hawai'i 287, 307, 893 P.2d 138, 158 (1995).

The jury's unchallenged exoneration of Dr. Robinson regarding the issue of breach of duty defeats Takayama's claim regardless of any assigned error regarding the two motions because: (1) we affirm the trial court's ruling regarding Takayama's proffered rebuttal evidence; (2) Takayama did not challenge the jury's finding in the trial court that Dr. Robinson was not negligent and therefore did not breach a duty to Takayama; (3) she also does not otherwise challenge the finding on appeal; and (4) the issue of causation is therefore moot. Accordingly, we hold that any error in the trial court's denial of Takayama's motions for directed verdict or for JNOV or new trial was harmless.

## IV. *CONCLUSION*

For the foregoing reasons, the judgment of the trial court is affirmed.