985 F.Supp. 1241 (1997)
Efren B. DOMINGO, By and Through his wife and Conservator, Naomi DOMINGO, and Naomi Domingo, individually, and the mother and next friend of Alden Scott Domingo, a minor and of Nayren Denese Domingo, a minor, Plaintiffs,
v.
Dr. John DOE[1]; Orthopedic Associates of Hawai`i, Inc.; The Queen's Medical Center; John Does 1-10; Doe Corporations 1-10; Doe Partnerships 1-10; Doe Limited Partnerships 1-10; Doe Entities 1-10; Unincorporated Does 1-10, Defendants.
No. CIV. 96-00679 DAE.
United States District Court, D. Hawai`i.
December 12, 1997.
*1242 Wesley D. Shimazu, Edmunds & Verga, Honolulu, HI, Edward K. Placek, Jr., Honolulu, HI, John S. Edmunds, Edmunds Maki Verga & Thorn, Honolulu, HI, for Efren B. Domingo, Naomi Domingo, Alden Scott Domingo, Nayren Denese Domingo.
Patricia C. Aburano, Diana M. Allen, Burke Sakai McPheeters & Bordner, Honolulu, HI, Edmund Burke, Burke Sakai McPheeters, Bordner Iwanaga & Estes, Honolulu, for Thomas J. Kane, III, M.D.
Lee T. Nakamura, Danielle N. Degele-Mathews, Fujiyama Duffy & Fujiyama, Honolulu, HI, for Orthopedic Associates of Hawai`i, Inc.
George B. Apter, Brian Yukio Hiyane, Watanabe Ing & Kawashima, Honolulu, HI, for Queen's Medical Center.
ORDER GRANTING DEFENDANT QUEEN'S MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT
DAVID ALAN EZRA, District Judge.
The court heard Defendant's Motion on November 17, 1997. John S. Edmunds, Esq., appeared at the hearing on behalf of Plaintiffs; Edmund C. Burke, Esq., appeared at the hearing on behalf of Defendant Dr. John Doe; Lee T. Nakamura, Esq., appeared at the hearing on behalf of Defendant Orthopedic Associates; James Kawashima, Esq., appeared at the hearing on behalf of Defendant Queen's Medical Center. After reviewing the motion and the supporting and opposing memoranda, the court GRANTS Defendant Queen's Medical Center's Motion for Summary Judgment.

BACKGROUND
Defendant Dr. John Doe ("Dr.Doe") graduated from the University of California at Davis Medical School in 1977. He began his general surgery residency at UC Davis Sacramento Medical Center in July of 1978. Dr. Doe withdrew from the residency program in June of 1981 because of alcohol and drug related problems.
After withdrawing from the residency program, Dr. Doe entered a 30-day in-patient treatment program at Las Encinas Hospital in Pasadena. In his deposition, Dr. Doe states that he entered the treatment program after receiving two tickets for driving while under the influence of alcohol. Deposition of Dr. Doe, p. 38.
In June of 1984, Dr. Doe was accepted into the orthopedic surgery residency program at the University of Hawaii Burns Medical School. In November of 1984, Dr. Doe entered a 30-day treatment program at Castle Medical Center, after suffering an alcohol relapse. Dr. Doe was terminated from the residency program in December of 1984 as a result of this alcohol relapse. Id. at 147.
On January 7, 1985, Dr. Doe was admitted to the emergency room at Queen's Medical Center. At that time, he was diagnosed with acute alcoholic hepatitis, adult respiratory distress, and renal failure. Id. at 153. After the January 7 incident, Dr. Doe sought help from Alcoholics Anonymous. Dr. Doe asserts that he has been drug free since his arrival in Hawaii in 1984 and alcohol free since his release from the hospital in January of 1985.
In January of 1986, Dr. Doe was admitted to the general surgery residency program at the University of Hawaii Burns Medical School. As a condition of enrollment in the program, Dr. Doe agreed to undergo random drug testing. Dr. Doe was randomly drug tested on six separate occasions with negative results.
In July of 1987, Dr. Doe was admitted into the orthopedic surgery residency program at *1243 the University of Hawaii. Dr. Doe completed his residency in June of 1991.
Dr. Doe was hired by Defendant Orthopedic Associates of Hawaii ("Associates") in September of 1992.[2] At the time Associates hired Dr. Doe, Associates was aware that Dr. Doe had a history of drug and alcohol abuse "which nearly terminated his medical career in the early 1980's." See Credentialing File, p. 53, attached as Exhibit "BB" to Plaintiffs' Appendix. As a result of Associates' "ongoing concern with Dr. Doe's previous condition," Associates instituted "a surveillance program with unannounced urine testing for the foreseeable future." Id. Dr. Doe was subjected to seven or eight random drug tests from 1992 to 1994. All drug tests were negative. Deposition of Dr. Doe, pp. 170-172.
On March 20, 1992, Dr. Doe applied for orthopedic surgery privileges at Defendant Queen's Medical Center ("Queen's"). At the time of his application, Queen's was aware of Dr. Doe's prior substance abuse problems. Declaration of Dr. Drake Will, ¶ 8. On November 19, 1992, Queen's granted Dr. Doe hospital privileges.
On August 8, 1994, Dr. Doe performed hip revision surgery on Plaintiff Efren Domingo ("Domingo") at Queen's Medical Center. Following this second surgery, Domingo went into a coma and was diagnosed with fat emboli syndrome ("FES"), a rare condition where the fat emboli (particles of fat) are released into the circulatory system and compromise the circulation of the blood. As a result of the FES, Domingo suffered catastrophic brain damage which has left him with severe mental and physical impairments. Plaintiffs filed suit against Dr. Doe, Orthopedic Associates of Hawaii, and Queen's Medical Center on August 8, 1996.

STANDARD OF REVIEW
Rule 56 provides that summary judgment shall be entered when:
[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.
Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. Id. at 322, 106 S.Ct. at 2551.
Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986) (citation omitted).
A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *1244 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. Id. The evidence submitted by the nonmovant, in opposition to a motion for summary judgment, "is to be believed, and all justifiable inferences are to be drawn in [its] favor." Id. at 255, 106 S.Ct. at 2513. In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. Id. at 254, 106 S.Ct. at 2513. The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. See Celotex, 477 U.S. at 322, 106 S.Ct. at 2551.
At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. Musick v.. Burke, 913 F.2d 1390, 1394 (9th Cir.1990). The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. Id. (citation omitted).

DISCUSSION

I. Plaintiffs' Claim for Negligence
In their amended complaint, Plaintiffs assert a cause of action against Queen's for negligence. As the factual basis for this cause of action, Plaintiffs allege that Queen's negligently granted Dr. Doe operating privileges, even though it was aware of Dr. Doe's prior substance abuse. Plaintiffs contend that Queen's negligence was a direct and proximate cause of Plaintiffs' injuries. Defendant Queen's maintains that it is entitled to summary judgment on Plaintiffs' negligence claim because Dr. Doe's substance abuse occurred more than nine years prior to Domingo's surgery and Plaintiffs have failed to produce any evidence that Dr. Doe was actually impaired at the time of surgery or at any other time after 1985.
To prevail on their negligence claim, Plaintiffs must establish the following elements:
(1) A duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks;
(2) A failure on the defendant's part to conform to the standard required: a breach of the duty;
(3) A reasonably close causal connection between the conduct and the resulting injury[;] and
(4) Actual loss or damage resulting to the interests of another.
Takayama v. Kaiser Foundation Hosp., 82 Hawai`i 486, 923 P.2d 903, 915-916 (1996) (citation and internal quotation marks omitted).
In this case, Plaintiffs are asserting that Queen's had a duty to deny hospital privileges to Dr. Doe based on his prior substance abuse. Plaintiffs are asserting that Queen's breached this duty by granting hospital privileges to Dr. Doe. Numerous jurisdictions have recognized that a hospital has a duty to exercise reasonable care in selecting physicians for its medical staff. See, e.g., Rodrigues v. Miriam Hospital, 623 A.2d 456, 462 (R.I.1993); Albain v. Flower Hospital, 50 Ohio St.3d 251, 553 N.E.2d 1038, 1045 (1990), rev'd on other grounds Clark v. Southview Hosp. & Family Health Center, 68 Ohio St.3d 435, 628 N.E.2d 46 (1994); Pedroza v. Bryant, 101 Wash.2d 226, 677 P.2d 166, 170 (1984) (en banc); Johnson v. Misericordia Comm. Hosp., 99 Wis.2d 708, 301 N.W.2d 156, 164 (1981); Strickland v. Madden, 323 S.C. 63, 448 S.E.2d 581, 586 (Ct.App.1994); Purcell v. Zimbelman, 18 Ariz.App. 75, 500 P.2d 335 (1972).
Hawaii has not expressly recognized a cause of action against hospitals for the negligent granting of hospital privileges. However, Hawaii does recognize a cause of action for negligent hiring. See Janssen v. American Hawaii Cruises, Inc., 69 Haw. 31, 731 P.2d 163, 165 (1987). As the Hawaii Supreme Court explained in Janssen:

*1245 `A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless ... (b) in the employment of improper person or instrumentalities in work involving risk of harm to others[.]' Most jurisdictions recognize a duty on the part of the employer to exercise reasonable care in hiring individuals who, because of the nature of their employment, may pose a threat of injury to members of the public.
Id. at 166 (citations omitted).
Although this language does not directly apply to a hospital who grants surgical privileges to physicians, the rationale behind this cause of action does apply. Hospitals have a responsibility to ensure the quality of the medical care and treatment which is provided at their facilities. Patients who seek medical treatment from their doctors do not do so in isolation. "The community hospital has evolved into a corporate institution, assuming `the role of a comprehensive health center ultimately responsible for arranging and coordinating total health care.'" Pedroza, 677 P.2d at 169 (citation omitted). "Hospitals are also in a superior position to monitor and control physician performance. Since it is estimated that seventy-five to eighty percent of all medical malpractice claims arise in hospitals, the institution is the logical starting place for addressing problems of professional incompetence.... Forcing hospitals to assume responsibility for corporate negligence may also provide those hospitals a financial incentive to insure the competency of their medical staff." Id. at 169-170 (citation and internal quotation marks omitted). Therefore, although Hawaii has not expressly determined that a hospital has a duty to ensure that it only grants hospital privileges to competent physicians, the court concludes that this duty is a logical extension of the recognized cause of action for negligent hiring. The recognition of this duty is also supported by the public policy of ensuring that hospitals exercise reasonable care in protecting the public from the foreseeable risks posed by the appointment of incompetent physicians. If presented with this question, it is this court's considered judgment that the Hawaii Supreme Court would recognize such a duty.
Plaintiffs must still prove, however, that Associates owed a duty to Plaintiffs under the facts of this case. Whether a duty exists in a particular case is a question of law for the court to decide. See Doe v. Grosvenor Properties (Hawaii) Ltd., 73 Haw.158, 829 P.2d 512, 514 (1992). "The existence of a duty under a negligent hiring theory depends upon foreseeability, that is, `whether the risk of harm from the dangerous employee to a person such as the plaintiff was reasonably foreseeable as a result of the employment.'" Janssen, 731 P.2d at 166 (citation omitted). Therefore, in order to establish that Queen's owed a duty to Plaintiffs, Plaintiffs must establish that it was reasonably foreseeable at the time it granted Dr. Doe's hospital privileges, that Dr. Doe would cause Plaintiffs' injuries.
Queen's granted hospital privileges to Dr. Doe in 1992. When it granted these privileges, Queen's was aware that Dr. Doe had prior substance abuse problems.[3]See Credentialing File, attached as Exhibit "BB" to Plaintiffs' Appendix; Declaration of Dr. Drake Will, p. 3, attached to Queen's Motion for Summary Judgment. Specifically, Queen's knew that Dr. Doe had been terminated from two residency programs because of substance abuse, one in 1981 and one in 1984. Dr. Doe also informed Queen's about his alcohol relapses and his attempts to seek medical treatment for his substance abuse. See Credentialing File, p. 57. In addition, Queen's received a letter from Dr. Doe's *1246 employer, Associates, which stated that Dr. Doe "has a past history of drug and alcohol abuse, which nearly terminated his medical career in the early 1980s." Credentialing File, p. 53. Plaintiffs contend that based on this information, Queen's had a duty to deny Dr. Doe hospital privileges.
However, Queen's also received extensive evidence that Dr. Doe's substance abuse problem ended in 1985 and that "his past problems had not affected his performance as an orthopedic surgeon." Defendant Queen's Memorandum in Support of Motion for Summary Judgment, p. 10. In his application, Dr. Doe stated he had been clean and sober since 1985. Queen's also received a letter of recommendation from Dr. James Doyle, the program director for the Department of Orthopedic Surgery at the University of Hawaii Burns Medical School, which stated that Dr. Doe had been drug free for many years. Queen's additionally received the following information from people who had worked with Dr. Doe:
Dr. Doe also received an `excellent' overall assessment from Dr. William O'Brien, the Chief of Orthopedic Reconstructive Services at Rancho Los Amigos, where he had completed a one year fellowship;
Dr. Whelan, the former director of the University of Hawaii Surgical Residency Program rated Dr. Doe's performance in that program as `exemplary,' noted that Dr. Doe `performed exceedingly well,' was `one of our best residents, academically, and completely responsible clinically' further noted Dr. Doe's continued participation in Alcoholics Anonymous and with drug rehabilitation and concluded that Dr. Doe was a `real success story', expressing `every confidence in his continuing success and continuing sobriety';
Dr. Alan Pavel, an orthopedic surgeon on staff at QUEEN'S, had observed Dr. Doe perform a variety of orthopedic cases, including total joint replacements, and noted that Dr. Doe had `excellent knowledge and judgment' and that his surgical ability `is well above the average orthopedic surgeon at Queen's';
Dr. Alan Richardson, on behalf of ORTHOPEDIC ASSOCIATES, which had hired Dr. Doe to start in September 1992, noted that Dr. Doe had `excellent rapport with both staff and patients,' had maintained his sobriety for seven years and that, though ORTHOPEDIC ASSOCIATES did not believe Dr. Doe had any ongoing problems with substance abuse, it would nevertheless institute random urine testing.
Defendant Queen's Memorandum in Support of Motion for Summary Judgment, pp. 9-10 (citations omitted).
Despite this evidence, Plaintiffs nevertheless contend that it was reasonably foreseeable at the time Queen's granted Dr. Doe hospital privileges, that Dr. Doe would cause Plaintiffs' injuries. However, Plaintiffs provide absolutely no evidence that Dr. Doe was under the influence of drugs or alcohol at the time of Domingo's surgery, or that Dr. Doe even used any drugs or alcohol after 1985. Plaintiffs also fail to furnish any evidence which suggests that Dr. Doe's prior substance abuse was a factor in his performance of Domingo's surgery.[4]
Instead, Plaintiffs contend that Queen's should be held liable for Plaintiffs' injuries because it was reasonably foreseeable that Dr. Doe would exercise "bad judgment" during his surgical procedures. Essentially, Plaintiffs argue that because Dr. Doe exercised "bad judgment" over seven years ago in consuming drugs and alcohol, Queen's should have foreseen that Dr. Doe would exercise "bad judgment" in conducting Domingo's surgery.
Even if this court were to conclude that Dr. Doe exercised "bad judgment" in performing Domingo's surgery, or that he was negligent in performing this surgery, this court would still have to make a giant *1247 leap in concluding that Dr. Doe's prior substance abuse made this negligence reasonably foreseeable to Queen's.[5] Prior to Domingo's surgery in 1994, Dr. Doe had performed approximately 150 primary total hip replacement surgeries and 49 total hip replacement revision surgeries. See Deposition of Dr. Doe, pp. 200-204, attached as Exhibit "B" to Defendant Queen's Motion for Summary Judgment. Plaintiffs provide no evidence that Dr. Doe was negligent in performing any of these earlier surgeries, or that as a result of these surgeries, Queen's should have been put on notice of Dr. Doe's alleged incompetence as a surgeon.
Based on this factual record, the court concludes that Queen's could not reasonably foresee that Domingo would be injured as a result of Dr. Doe's performance of his hip revision surgery. The court therefore finds that, as a matter of law, Queen's did not owe Plaintiffs a duty to deny Dr. Doe hospital privileges. Accordingly, the court GRANTS Queen's Motion for Summary Judgment as to Plaintiffs' cause of action for negligence.

II. Plaintiffs' Claim for Negligent Supervision
In their amended complaint, Plaintiffs also assert a cause of action against Queen's for negligent supervision. Plaintiffs contend that based on Queen's knowledge of Dr. Doe's prior substance abuse, Queen's had a duty to supervise Dr. Doe's surgical procedures. Plaintiffs' Amended Complaint, p. 23.
Although Hawaii courts have yet to address the issue of whether a hospital has a duty to supervise its physicians, Hawaii courts have, in general, recognized the validity of a cause of action for negligent supervision. See Abraham v. S.E. Onorato Garages, 50 Haw. 628, 446 P.2d 821, 826 (1968). Other state courts which have specifically addressed this issue have concluded that a hospital has a duty to supervise the doctors on its medical staff. See, e.g., Thompson v. Nason Hospital, 527 Pa. 330, 591 A.2d 703, 709 (1991); Oehler v. Humana, Inc., 105 Nev. 348, 775 P.2d 1271, 1272 (1989); Sharsmith v. Hill, 764 P.2d 667, 673 (Wyo.1988); Fridena v. Evans, 127 Ariz. 516, 622 P.2d 463 (1980) (en banc). The court therefore concludes that the Hawaii Supreme Court would recognize a cause of action against a hospital for the negligent supervision of physicians who have surgical privileges at the hospital under appropriate circumstances.
The courts which have recognized this cause of action have not imposed an absolute duty upon the hospital to ensure the safety of its patients. Instead, these courts have recognized that the hospital's duty should be limited to situations where the hospital knows or should know of the physician's deficient treatment or where the physician's negligence is obvious. See, e.g., Sharsmith, 764 P.2d at 673 (citing cases).
Plaintiffs argue that Queen's should have known that Dr. Doe would negligently perform Domingo's surgery based on his prior history of substance abuse. As discussed in the previous section, however, Queen's knowledge of Dr. Doe's prior substance abuse did not make it reasonably foreseeable that Dr. Doe would negligently perform Domingo's surgery. Prior to Domingo's surgery in 1994, Dr. Doe had performed approximately 150 primary total hip replacement surgeries and 49 total hip replacement revision surgeries without apparent incident. See Deposition of Dr. Doe, pp. 200-204, attached as Exhibit "B" to Defendant Queen's *1248 Motion for Summary Judgment. Plaintiffs do not provide the court with any evidence which suggests that Dr. Doe was negligent in performing any of these surgeries or that Dr. Doe's prior substance abuse in any way affected his ability to perform these surgeries. Plaintiffs additionally fail to provide the court with any evidence that Dr. Doe was actually impaired by drugs or alcohol at the time of Domingo's surgery.
Based on this factual record, the court concludes that, as a matter of law, Queen's did not have a duty to specifically supervise Dr. Doe's surgical procedures, as opposed to any other physician on its medical staff. The court therefore GRANTS Queen's Motion for Summary Judgment as to Plaintiffs' cause of action for negligent supervision.

III. Plaintiffs' Cause of Action for Breach of Implied Warranties
In their amended complaint, Plaintiffs assert a cause of action against Queen's for breach of implied warranties. As the factual basis for this cause of action, Plaintiffs allege that Queen's failed to disclose Dr. Doe's prior substance abuse to Plaintiffs. Plaintiffs contend that by failing to disclose this information, Queen's breached an implied warranty that Dr. Doe did not have such a "disability." Plaintiffs' Amended Complaint, p. 24.
In this cause of action, Plaintiffs are essentially contending that Queen's should have disclosed Dr. Doe's prior substance abuse so that Plaintiffs could have given an informed consent to Dr. Doe's performance of the hip revision surgery. The few courts which have addressed this issue have concluded that a hospital does not have an independent duty to obtain the informed consent of the physician's patients. See Johnson v. Sears, Roebuck & Co., 113 N.M. 736, 832 P.2d 797, 800 (Ct.App.1992); Goss v. Oklahoma Blood Institute, 856 P.2d 998, 1007 (Okla.Ct.App. 1990); Krane v. Saint Anthony Hosp. Systems, 738 P.2d 75, 77 (Colo.Ct.App.1987).
In this case, Plaintiffs are attempting to impose liability on Queen's for its failure to disclose Dr. Doe's prior substance abuse. However, Plaintiffs have failed to provide the court with any authority for the proposition that a hospital is required to disclose this information to a physician's patients, absent a showing that the hospital knew that the physician had or was likely to perform treatment on patients while under the influence of drugs or alcohol. Additionally, Plaintiffs have failed to establish that Dr. Doe was even required to disclose this information to Plaintiffs given the fact that he had not used drugs or alcohol for approximately ten years. See Order Granting in Part and Denying in Part Defendant Doe's Motion for Summary Judgment, pp. 16-18. The court therefore concludes that Plaintiffs have failed to establish, as a matter of law, that Queen's had a duty to disclose Dr. Doe's prior substance abuse to Plaintiffs. Accordingly, the court GRANTS Queen's Motion for Summary Judgment as to Plaintiffs' cause of action for breach of implied warranty.

CONCLUSION
For the reasons stated above, the court GRANTS Defendant Queen's Motion for Summary Judgment.[6]
IT IS SO ORDERED.
NOTES
[1] In this case, the parties have entered into a stipulated protective order with regard to this particular defendant. In light of the fact that there is no evidence that this Defendant has used any drugs or alcohol in the past ten years, the court finds that no public purpose would be served by the disclosure of his name. The court has therefore redacted this information in order to protect his identity.
[2] In its concise statement of facts, Associates states that Dr. Doe's employment contract began on January 1, 1994. As support for this statement, Associates provides the declaration of its attorney, Lee T. Nakamura. In the declaration, Nakamura alleges that Dr. Doe was hired on or about January 1, 1994. However, in his deposition, Dr. Doe states that he was hired by Associates in September of 1992. See Deposition of Dr. Doe, p. 168. Defendant Queen's Medical Center also states that Dr. Doe began working for Associates in September of 1992. See Defendant Queen's Medical Center's Concise Statement of Facts, ¶ 12. A letter from Associates to Queen's Medical Center indicates that Dr. Doe started working for Associates in September of 1992. See Credentialing File, p. 53, attached as Exhibit "BB" to Plaintiffs' Appendix. In a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party. The court must therefore assume for purposes of this motion that Dr. Doe was hired by Associates in September of 1992.
[3] Plaintiffs dispute the fact that Queen's was aware of Dr. Doe's problems with specific drugs, i.e. cocaine. Plaintiffs contend that Queen's was negligent in failing to develop a detailed drug history for Dr. Doe prior to granting him hospital privileges at Queen's. Plaintiffs do not, however, provide any evidence that Dr. Doe used any drugs or alcohol since 1985, nor do they provide any evidence that Dr. Doe was impaired by drugs or alcohol at the time of surgery. Therefore, even if the court were to conclude that Queen's should have developed a more detailed drug history for Dr. Doe prior to granting him hospital privileges at Queen's, this would still not establish that it was reasonably foreseeable to Queen's that Dr. Doe would allegedly perform Mr. Domingo's surgery in a negligent manner.
[4] Plaintiff's expert, Dr. Harrington, does state that Dr. Doe's behavior at the time of surgery was "irrational." Deposition of Dr. Harrington, p. 80, attached as Exhibit "C" to Plaintiffs' Appendix. However, Dr. Harrington was not present at the time of surgery and Dr. Harrington cannot correlate Dr. Doe's "irrational" behavior to his prior substance abuse. Furthermore, Dr. Harrington is not qualified to render an expert opinion as to whether Dr. Doe's prior substance abuse caused this allegedly "irrational" behavior. Id. at 81.
[5] Following Plaintiffs' argument to its logical conclusion, this court would have to conclude that every time a hospital had knowledge of a doctor's prior substance abuse, and nevertheless granted that doctor hospital privileges, the hospital could then be held liable for any negligent acts committed by the doctor while on the hospital medical staff, regardless of whether the doctor's prior substance abuse was a factor in that negligence. The court finds that this conclusion is not supported by case law or public policy. In order to hold a hospital liable for the negligent granting of hospital privileges, the hospital must have been put on notice of a foreseeable risk posed by the doctor. The fact that a doctor may have had a substance abuse problem more than seven years prior to the granting of hospital privileges simply does not make it reasonably foreseeable that the doctor would at some point allegedly perform a surgery in a negligent manner, where there is absolutely no evidence that the alleged negligence was in any way connected to the prior substance abuse problem.
[6] The court notes that Defendant Queen's has additionally asked for certification and entry of final judgment pursuant to Federal Rule of Civil Procedure 54(b). However, as Queen's has failed to raise any arguments in support of the appropriateness of such certification at this stage of the proceedings, the court declines to rule on this issue until such time as Queen's presents a proper motion for Rule 54(b) certification.